John J. KERRIGAN, Petitioner,

v.

Palmer C. SCAFATI, Superintendent, Massachusetts Correctional Institution, Walpole, Massachusetts, Respondent.

Misc. No. 65–32–F.

United States District Court
D. Massachusetts.

Nov. 29, 1965.

William E. O'Halloran, Newtonville, Mass., for paintiff.

Edward W. Brooke, Atty. Gen., Boston, Mass., and Richard F. Kelley, East Cambridge, Mass., for defendant.

FRANCIS J. W. FORD, District Judge.

This is a petition for a writ of habeas corpus brought by one John J. Kerrigan who is at present in custody under sentence of death following his conviction September 21, 1961 on an indictment charging him with murder. This conviction was affirmed, Commonwealth v. Kerrigan, 345 Mass. 508, 188 N.E.2d 484, and the denial of a subsequent motion for a new trial was affirmed. Commonwealth v. Kerrigan, 346 Mass. 786, 196 N.E.2d 190, cert. denied, 377 U.S. 1004, 84 S.Ct. 1943, 12 L.Ed.2d 1054. In a second motion for a new trial Kerrigan raised, apparently for the first time, the constitutional questions on which he relies in his present petition. Denial of this motion was affirmed, Commonwealth v. Kerrigan, Mass., 207 N.E.2d 882.

## FINDINGS OF FACT

In the early morning of September 3, 1960 Laurence W. Gorman, an officer of the Cambridge Police Department, was shot and died shortly thereafter. One Edgar W. Cook was arrested near the murder scene. He had been shot in the leg. The police had evidence indicating that a companion had been with Cook at the scene of the murder.

Cook was indicted for the murder of Gorman. On May 14, 1961, before he had been brought to trial, he and another prisoner named Porter escaped from jail. In the course of the escape Robinson, the deputy master of the jail, was murdered. On May 17, 1961 one Fratus informed the police that Cook had been brought to Fratus' apartment. When the police tried to enter the apartment, Cook shot himself and died a few hours later.

On September 3, 1960 Officer John F. Galligan of the Cambridge Police was investigating the murder of Gorman. He met petitioner John J. Kerrigan on the street, arrested him and took him to the Cambridge Police Station at about 3:10 p. m.

Kerrigan was questioned at the police station from 3:35 p. m. to about 5:00 p. m. He told police to ask him anything they wanted and that he would tell them anything they wanted to know. He was cooperative and voluntarily talked during the conversation. The questions put to Kerrigan dealt with his whereabouts on that morning and on the previous day and whether or not he knew Edgar Cook.

Cook on September 3 had been booked on suspicion of the murder of Gorman. During the interrogation on September 3 Kerrigan was never accused of that murder, nor in any manner was he a prime suspect. After the interrogation he remained in the police station smoking and drinking coffee until he was released at 4:00 a. m. on September 4, 1960.

Kerrigan was informed by the police that he could use the telephone to call a lawyer. He did not ask to use the phone for this purpose but did ask for and received permission to call his sister, who came to meet him at the station when he was released.

During September 3 and 4, 1960 several other persons were brought in by the Cambridge police and questioned about the Gorman murder. A general investigation of the Gorman murder was being conducted by the police.

Kerrigan was known to the police to have become acquainted with Edgar Cook while both had been serving sentences at the Walpole Correctional Institution, and believed by them to have associated with Cook after their release.

On April 26, 1961 Kerrigan was arrested at his home by the Boston police. He was booked on suspicion of robbery of a loan company in Boston, was questioned

about that robbery, and released on the same day. This arrest was entirely unrelated to the Gorman murder. At the time of Kerrigan's arrest, one John W. Fratus was with him in his home. Kerrigan introduced Fratus to the police as a Mr. Creighton. Before taking Kerrigan from his home the arresting officers permitted him to use the telephone to call a friend. At the police station he was informed that he had a right to use the telephone to call a lawyer, but did not ask to do so. No interrogation of Kerrigan as a result of this arrest was used at his trial.

On May 17, 1961 Officers Cunningham and Moar of the Boston Police Department, as a result of information given to the police by Fratus, above referred to, that Kerrigan had brought Edgar Cook, the escapist who had been indicted for the Gorman murder, to Fratus' apartment, entered Kerrigan's home with drawn guns, arrested him and handcuffed him. On this occasion he was not allowed to use the telephone before being taken from the house. Officers Cunningham and Moar were not investigating the Gorman murder.

Kerrigan was taken by the officers to Fratus' apartment at 41 Bay State Road, Boston, where shortly before Cook had shot himself. These officers on the way to Bay State Road did not accuse Kerrigan of the Gorman murder; they were not investigating it and did not question him about it. Also, they did not tell him that Cook had made a statement implicating him in that murder.

Kerrigan was not questioned at Bay State Road, made no request for a lawyer, and after a short while was taken to Boston Police Headquarters where he was booked on suspicion of being an accessory after the fact to the murder of Robinson, the jail officer who was murdered during Cook's escape from jail. At the time he was booked his attention was called to a sign posted in the police station about five feet from where he was standing which read in pertinent part as follows:

"BOSTON POLICE DEPARTMENT

ATTENTION!

ALL PERSONS UNDER ARREST READ THIS NOTICE

---

RIGHT TO USE TELEPHONE BY PERSONS UNDER ARREST

CHAPTER 276 OF THE GENERAL LAWS OF MASSACHUSETTS PROVIDES AS FOLLOWS:

Section 33A.—The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed of his right to so use the telephone immediately upon being booked, and such use shall be permitted within one hour thereafter."

Kerrigan made no request to use the telephone to call a lawyer and made no request for one. At Kerrigan's request, however, before he had been booked, Lieutenant Jordan allowed him to use the telephone to call a friend, a Mrs. Hathaway. He told her where he was and asked her to inform his sister that the sister's child had been left unattended at home when he was taken away by the police. He also told her that he was all right, that he did not need a lawyer, evidence of a waiver, and that he would be out of there in the morning. The Court finds he could have had the assistance of a lawyer if he wished. Obviously, the Gorman and Robinson murders and the escape of Cook, occurring in Cambridge, were not the concern of the Boston Police. He was booked by the Boston Police on May 17, 1961 on suspicion of being

an accessory after the fact of the Robinson murder.

About 11:15 p. m. on May 17, 1961 Kerrigan was lodged in the Boston City Jail. About 2:30 a. m. on May 18, 1961 he was questioned there by Captain John Moriarty of the Massachusetts State Police who had been assigned to the Middlesex County District Attorney's Office to investigate the jail escape and the murder of Robinson. This interrogation lasted about three quarters of an hour. Kerrigan was not questioned about the Gorman murder and was not accused of having any part in the Gorman murder. Kerrigan at no time on May 18 during this interrogation asked for a lawyer or asked to use the telephone or made any request for bail at any time.

About 8:10 a. m. on May 18, 1961 Kerrigan appeared in a lineup at Boston Police Headquarters. One Richard Walsh, who had also been booked on the previous evening on suspicion of being an accessory after the fact to the Robinson murder, was in the lineup. Kerrigan was asked if he knew why he was arrested this time. He answered, "I understand I was arrested for accessory after the fact, to murder." Lieutenant-Detective Campbell then said to him, "Well, John, for your information you were observed sometime yesterday morning in the company of Mr. Edgar Cook and that is the reason you are in here."

About 11:00 a. m. on May 18, 1961 Kerrigan was brought to the Cambridge Police Station. Captain John Grainger was in charge of the station at that time. Kerrigan's sisters had already arrived at the station. Captain Grainger asked him if he wanted to talk to them and at his request was allowed to do so in Captain Grainger's office in Grainger's presence. He received permission from Grainger to give them money. He gave his sister Mrs. Hall twenty dollars for cab fares and asked her to get in touch with an attorney named Paul Smith. Kerrigan made no request to delay proceedings until he consulted an attorney. He told his sisters, "I don't know what they got

me in here for." Kerrigan never asked Grainger for an attorney.

Grainger thereafter had some conversation with Kerrigan in his office in which no mention was made of the Gorman murder. In fact, Captain Grainger had no knowledge that Fratus had implicated Kerrigan in the Gorman murder. In fact Kerrigan was not a prime suspect in the Gorman murder.

During the afternoon of May 18, 1961 Kerrigan was questioned for from forty minutes to an hour by Lieutenant Hallice of the Cambridge Police, who had just returned from Lowell looking for Cook and knew nothing of what Fratus had already told the police. At this time Lieutenant Hallice had no knowledge Kerrigan was implicated in the Gorman murder, nor was Kerrigan a prime suspect in the Gorman murder at that time. In fact, Hallice had no facts to implicate Kerrigan in the Robinson murder. A tape recording of this interrogation was made and was played at his hearing before this Court. Kerrigan was not asked about either the Robinson or Gorman murders. He was questioned about his associations with Cook since they had first met and as to his activities from Saturday, May 13, 1961 until his arrest on May 17. At the beginning of the interrogation Hallice told Kerrigan that if Kerrigan wanted to answer his questions, he would ask him some questions. Kerrigan said he would answer questions he determined to be pertinent or relative to the subject of himself and Cook. He in general answered questions freely, but refused to answer some questions put to him. Kerrigan knew his right to remain silent. No attempt was made to procure incriminating admissions, and he made none. He was told he could take notes if he wished to.

Hallice did not tell Kerrigan he was entitled to a lawyer. There was no need; Kerrigan knew his rights. At one time during the interrogation Kerrigan did make a reference to getting a lawyer. The following colloquy took place:

KERRIGAN But I have been in custody now, you know, since 9:30

last night, you know, and I haven't closed my eyes to speak of. And, you know, if I had an idea, I'd make arrangements to get a lawyer or what have you. I want to get this expedited one way or the other.

HALLICE John, if you think you need one—

KERRIGAN It's not that I need one. I don't even want to give him a dollar. I don't know how long it's going to take you to check this out.

No other reference to an attorney was made during the interrogation by Hallice.

Sergeant Norton of the Cambridge police was present during part of the time when Kerrigan was at the Cambridge Police Station. He asked Kerrigan some questions, none of which related to the Gorman murder. In fact, Sergeant Norton knew nothing of his implication in it. Kerrigan did not ask Norton about getting a lawyer and did not ask him for permission to use the telephone.

About 3:40 p. m. on May 18 Kerrigan was taken to the headquarters of the State Police in Cambridge. Here he was placed in a lineup. He and the other twelve persons in the lineup were observed by a woman, and asked to say individually in her presence the words, "Come on, let's get out of here." The purpose of this lineup was to see if the woman could identify anyone there as the person she had seen with Cook on the day before the Gorman murder. At this time the police also cut off a sample of Kerrigan's hair.

Kerrigan was then taken to another room for a confrontation with Fratus, referred to above and a friend of Kerrigan's. Fratus had reported to the police the presence of Cook in his apartment and had told them a story involving Kerrigan as the person who had brought Cook to the apartment. The primary and sole purpose of the police in arranging the confrontation was to check the story of Fratus by having him repeat it in the presence of Kerrigan and obtaining Kerrigan's reaction to it to determine if Kerrigan was the person referred to by Fratus as harboring Cook as an accessory after the fact to the Robinson murder. At this time the Gorman murder was not under consideration by Officer Crowley.

Present at the interrogation were Kerrigan, Fratus, Lieutenant Moriarty and Detective Crowley of the State Police, in charge of investigation of the Robinson murder, Captain Grainger, Lieutenant Hallice, Sergeant Norton and Officer Galligan of the Cambridge Police, and John J. Droney, the District Attorney of Middlesex County. A stenographic record of this meeting was made and a transcript of it introduced in evidence at the present hearing.

Kerrigan was asked questions about his acquaintance with Fratus and his visits to the 41 Bay State Road apartment and his association with Cook on May 17. Fratus in answer to questions then told his story of Kerrigan's bringing Cook to his apartment. Questioning of Kerrigan was resumed. Kerrigan then asked if he could call an attorney and have him present. The District Attorney asked if anyone had any questions and Lieutenant Moriarty replied "No, I think we have fnished, unless these gentlemen have anything else. He can call his attorney." Sergeant Norton then asked Kerrigan a few questions, plainly investigatory, about a telephone number and the questioning was ended at 4:40 p. m.

About 5:00 p. m. Kerrigan was taken to the East Cambridge Court House where he was arraigned on a charge of being an accessory after the fact to the murder of Robinson.

Kerrigan's sister, Mrs. Hall, after leaving Kerrigan at the Cambridge Police Station, returned home and then telephoned Attorney Paul Smith. As a result of her telephone conversation with him she later went to the office of another attorney, Louis Bobrich, who has since died, and retained him to represent her brother. Bobrich made a telephone call to someone and he told her her brother was being questioned. There was no

evidence as to whom Bobrich talked to. However, sometime during the afternoon Captain Grainger learned that Bobrich was representing Kerrigan.

When Kerrigan was taken to court for arraignment, Bobrich and Mrs. Hall were waiting for him in the corridor. Bobrich told him that he was representing him and that he would see him in the courtroom. There was no further conversation between them at that time. Bobrich was present with Kerrigan in the courtroom at the time of the arraignment.

On May 21, 1961 Fratus talked further with the police. At this time he told them of a conversation he had overheard between Cook and Kerrigan while they were in his apartment on May 17, which indicated that Kerrigan had been with Cook on the morning of September 3, 1960 and had been the one who shot Officer Gorman. This was the first time, May 21, that the police had received any specific item of evidence connecting Kerrigan with the Gorman murder. The police had no evidence before this that Kerrigan was implicated in the Gorman murder.

Kerrigan was indicted for the murder of Gorman May 22, 1961 after Fratus talked with the police on May 21. He was tried and convicted on these charges.

At the trial Fratus was called as a witness and over Kerrigan's objection was allowed to testify as to a conversation between Cook and Kerrigan in Fratus' apartment on May 17, 1961. In substance this conversation indicated that Kerrigan had been with Cook on the morning of September 3, 1960, and that Kerrigan had fired the shot which killed Officer Gorman.

At the Gorman murder trial several officers testified, on direct examination, without objection, as to statements made to them by Kerrigan on May 17 and 18. They testified that he had denied ever being to Bay State Road, as to his statements about his activities between May 14 and 17, as to his denials of having met Cook on certain occasions, his denial

of being acquainted with Fratus, and as to the confrontation between Kerrigan and Fratus and the statements made by them at that confrontation.

At his trial Kerrigan testified in his own defense. On cross-examination he was asked, without objection, about a number of statements he had made to the police on September 3, 1960 and May 18, 1961, which contradicted statements he had made during his direct testimony about such matters as his acquaintance with and association with Cook and Fratus. He testified that these statements made to the police had been false.

After Kerrigan had testified, Officer Galligan testified as to statements made by Kerrigan to the police on September 3, 1960 as to his activities on that day.

None of the statements of Kerrigan which were put into evidence at his trial in any way implicated him in the Gorman murder or any other crime. If true, they would have tended to exculpate him.

Nothing said by Kerrigan to Sergeant Norton after the time, near the end of the confrontation with Fratus, when for the first time Kerrigan asked to have an attorney, was introduced in evidence at the murder trial.

At the time of Kerrigan's arrest and interrogation on May 17 and 18, 1961, the police were concerned solely with the investigation of the escape of Cook and Porter from jail and the murder of Robinson. They were not at that time actively engaged in any investigation of the Gorman murder.

The arrest and interrogation of Kerrigan resulted from the information given by Fratus that Kerrigan had brought Cook to the Bay State Road apartment. The interrogation of Kerrigan was confined to matters relevant to the Robinson murder. Of course since the two murders were related, some questions relating to Kerrigan's association with Cook also had some relevance to the Gorman case. The purpose in asking them, however, was at that time only to obtain information as to the Robinson case. It was that murder the

police were investigating, as has been stated.

Up until the time of the confrontation between Fratus and Kerrigan, the interrogation of Kerrigan was still in an investigative state. The police had a story from Fratus linking Kerrigan to Cook's activities after his escape. It does not appear, however, that they were prepared to accept Fratus' statements and act upon them, at least until they had been put to test in the confrontation. It was not until this point that the Robinson investigation reached the accusatory stage so far as Kerrigan was concerned.

At no time on May 17 or 18 did the Gorman case reach an accusatory stage so far as Kerrigan's participation in that murder was concerned. The police had evidence indicating that Cook and a companion had been stopped by Officer Gorman after an unsuccessful attempt at breaking and entering, and that an exchange of shots had taken place in which Gorman was killed and Cook wounded. But Cook had never revealed who his companion was. Until Fratus told his complete story on May 21 the police had no information in any way indicating that Kerrigan had been Cook's companion. At most there may have been a suspicion that Kerrigan, as a known associate of Cook with a prior criminal record, may have been the man.

Kerrigan testified at the hearing on this petition that at various times he was accused by police officers of being implicated in the Gorman murder. He said that on the way to Bay State Road on May 17 the officers falsely told him that Cook had made a statement implicating him in the Gorman murder, and that Lieutenant Hallice had accused him of being with Cook at the time of the Gorman murder. The Court, seeing and hearing Kerrigan, does not credit this testimony and finds these statements were never made. The only reference to the Gorman murder during May 17 and 18 was a hypothetical question by Lieutenant Jordan at Boston Police Headquarters to the effect that if Kerrigan was the person who brought Cook

to Fratus' aparatment he might be the man who was with Cook when Gorman was killed. This was part of a general conversation of Kerrigan with the officers while he was waiting at the station and not made in the course of any formal investigation or interrogation.

Kerrigan testified at the hearing on this present petition that on September 3, 1960 and on May 17 and 18, 1961 he had lied to the police for the purpose of escaping involvement in the crimes being investigated. He also testified he had lied in testifying at the murder trial, and in a subsequent hearing before the Parole Board.

Kerrigan had been convicted of armed robbery in 1947 and had served a sentence in State Prison. In addition he admitted that before May 17, 1961 he had been arrested approximately ten times.

Kerrigan was not told in express terms by any police officers that he had a right to have counsel or that he had a right to remain silent.

Kerrigan was informed at the time he was booked at Boston Police Headquarters of his right to use the telephone.

The Court finds Kerrigan knew that he had a right to use the telephone and he knew that he had a right to have an attorney. He was an old hand at retaining attorneys. He had been convicted of armed robbery in 1947 and arrested ten times, as stated above. He was allowed to use the telephone when he requested permission to do so. He was allowed to talk to his sisters when they wished to see him, and to ask them to get in touch with an attorney for him.

An attorney was retained to represent Kerrigan. It can fairly be inferred that the latter communicated with some one in the police about the case and that he was informed of the time of his client's arraignment. The Court cannot find that there was any credible evidence that Bobrich made any request that he be allowed to talk to his client or that the police prevented him from seeing his client at any time.

Kerrigan was not coerced, intimidated, or tricked into making any statement. He understood that he was being questioned by the police as a result of information received by them that he had brought Cook to the Bay State Road apartment. He was asked if he wished to answer questions. He agreed to answer questions within the limitations of what he though pertinent and freely did so. He refused to answer some questions, and was not compelled to do so.

Kerrigan made no request at any time that the questioning be delayed until he could have an attorney present. Even after he had asked his sisters to get him a lawyer in the presence of Captain Grainger, he made no objection to go on with the interrogation without one. On at least two occasions he made statements positively indicating that he did not think he needed a lawyer. His attitude was not merely that he was willing to answer questions but that he affirmatively wanted the interrogation to proceed because he thought that, as on the occasion of his two previous arrests in September, 1960 and April, 1961, he could tell a story which would satisfy the police, exculpate him and bring about his release from custody.

## CONCLUSIONS

I find and rule that:

■ The police inquiry being conducted on May 17 and 18, 1961 was a general and investigatory inquiry into the unsolved crimes of the escape from the East Cambridge jail and the murder of Robinson. It was in no way an inquiry of any kind into the Gorman murder. (Cf. United States v. Konigsberg, 3 Cir., 336 F.2d 844 (853).

Kerrigan on May 17 and 18, 1961 was not a suspect in the Gorman murder. The only possible connnection of Kerrigan with any crime that the police had in mind during this inquiry was the suspicion that he was an accessory after the fact to the Robinson murder. This suspicion was based only on the statement of Fratus, which, prior to the confrontation between Fratus and Kerrigan, had not yet been accepted by the police as reliable.

The various interrogations to which Kerrigan was subjected on May 17 and 18, 1961 were not accusatory in nature, were not intended to elicit incriminating responses, and were not of such a nature that they lent themselves to eliciting incriminating responses.

Kerrigan was not coerced or tricked into making any statement to the police. He freely agreed to answer questions and answered only such questions as he considered pertinent. He was not only willing to answer questions but affirmatively sought an opportunity to make statements which he thought would lead to his release.

The statements made by Kerrigan to the police on May 17 and 18, 1961 were in themselves entirely exculpatory in nature. They were not incriminating. Any facts stated by him, if true, would tend to establish his innocence of any connection with either the Gorman or Robinson murders. (Cf. United States v. Guerra, 2 Cir., 334 F.2d 138 (145)).

■ Kerrigan was informed at the Boston Police Headquarters of his right to use the telephone. While he was not expressly told he had a right to counsel or a right to remain silent, no such statement was necessary because Kerrigan was fully aware of his rights in those respects.

Kerrigan did not at any time before his request made near the end of the confrontation with Fratus ask for a lawyer or ask to have questioning deferred until his lawyer could be present.

The police did nothing to prevent Kerrigan from obtaining legal counsel. He was allowed reasonable use of a telephone at his request, he was allowed to talk to his sisters and give them instructions as to getting him a lawyer

After requesting his sisters to get him a lawyer, Kerrigan freely elected to answer questions put to him by the police without waiting for the arrival of any lawyer retained by his sisters.

■ The interrogation of Kerrigan on May 18 and 19, 1961 was investigatory rather than accusatory within the rule of Escobedo v. State of Illinois, 378 U.S. 478, at page 492, 84 S.Ct. 1758, at page 1766, 12 L.Ed.2d 977 (June 22, 1964), where the court said, "Nothing we have said today affects the powers of the police to investigate 'an unsolved crime,' * * * by gathering information from witnesses and by other 'proper investigative efforts.' * * * We hold only that when the process shifts from investigatory to accusatory—when its focus is on the accused and its purpose is to elicit a confession—our adversary system begins to operate, and, under the circumstances here, the accused must be permitted to consult with his lawyer." The purpose of the police at any time was not to induce a confession of the Gorman murder. As stated, it was exploratory from beginning to end. The focus was not on Kerrigan at any time during the interrogation as being implicated in the Gorman murder. The police were merely giving Kerrigan a chance to explain his relationship with Cook. Nothing affects the power of the police to investigate an unsolved crime. See Spano v. People of State of New York, 360 U.S. 315 (327), 79 S.Ct. 1202, 3 L.Ed.2d 1265; United States v. Konigsberg, supra.

■ Under the circumstances of the present case Kerrigan was not, at the time he made any statement introduced in evidence at his trial, entitled to the assistance of counsel within the rule of the Escobedo case.

Kerrigan was not on May 17 and 18, 1961 deprived of his constitutional right to the assistance of counsel.

The use against Kerrigan at his trial of statements made by him during his interrogation on May 17 and 18, 1961 did not deprive Kerrigan of any of his constitutional rights.

## CONFRONTATION ISSUE

■ Kerrigan at his trial was not deprived of his constitutional right to be confronted with the witnesses against him at his trial or to cross-examine them, as he claims in his petition.

■ The testimony of Fratus at the trial as to admissions made in Fratus' presence by Kerrigan in conversation with Cook was admissible, and the testimony of Fratus as to Cook's statements in the course of the conversation was admissible to place the statements of Kerrigan in the proper context and make them understandable. It was Kerrigan's conduct with Cook that brought him in such relation to Cook as to make Cook's statement admissible when testified to by Fratus. (Cf. Salinger v. United States, 272 U.S. 542, 547, 548, 47 S.Ct. 173, 71 L.Ed. 398)

■ The testimony of Fratus as to the conversation between Kerrigan and Cook did not make Cook a testimonial witness against Kerrigan. The testimonial witness against Kerrigan was Fratus, whom Kerrigan had full opportunity to cross-examine.

The case of Pointer v. State of Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923, dealing with the use of a transcript of testimony given by a witness at a preliminary hearing when defendant was without counsel and opportunity for adequate cross-examination is inapplicable to the facts of the present case.

The case of Douglas v. State of Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934, dealing with the use of a prior statement made by a witness who at trial invoked his privilege against self-incrimination and could not be cross-examined, is inapplicable to the facts of the present case.

Kerrigan's right guaranteed by the Sixth Amendment to be confronted with the witnesses against him was not violated.

For the reasons stated the petitioner cannot prevail.

This case is not Escobedo and it is not applicable.

## THE RETROSPECTIVE APPLICATION OF ESCOBEDO

The petitioner here was convicted in the State Court of the murder of Gorman

on September 21, 1961, affirmed February 28, 1963. Escobedo, supra, was decided June 22, 1964.

It is this court's view, assuming the judgment in Kerrigan's case was final, there is an alternate ground for denying the petitioner relief.

The Supreme Court in Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601, held the Mapp rule did not require retrospective application.

■ The Supreme Court determined the question of prospective or retrospective operation of a new constitutional rule on the basis of the purpose of the rule. And, as stated by the Court in substance, the primary purpose for Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, was to deter illegal searches and seizures in the future by lawless police officers. (Linkletter, 381 U.S. p. 636, 85 S.Ct. 1731.) The purpose of Escobedo as with Mapp was to deter avoidance by police abuses of the constitutional rights inherent in due process. Cf. United States ex rel. Walden v. Pate, 350 F.2d 240 (C.A.7th Cir.—July 27, 1965) where it is stated: "In order to put an end to a system fraught with potential abuses, the Supreme Court in Escobedo decided to remove the incentive to deny an accused the right to counsel by rendering inadmissible any confession obtained while such denial was in effect. It is because of the similarity of purposes that we, as the Supreme Court did with the Mapp rule in Linkletter v. Walker, hold that the rule of Escobedo does not apply retrospectively." Cf. United States ex rel. Russo v. State of New Jersey, 351 F.2d 429 (3 C.A. May 20, 1965); Collins v. Beto, 5 Cir., 348 F.2d 823 (Note Judge Friendly's reluctance in his concurring opinion to apply Escobedo retrospectively. (Page 837)); In re Lopez, Cal., 42 Cal.Rptr. 188, 398 P.2d 380; State v. Johnson, 43 N.J. 572, 206 A.2d 737; and Commonwealth v. Negri, 419 Pa. 117, 213 A.2d 670, September 29, 1965). The waters are turbid. Until the Supreme Court speaks, the question of how expansively Escobedo may be applied will remain in doubt.

It is true the Supreme Court has applied rules in cases retrospectively. (Notes 13, 20, Linkletter, 381 U.S. pp. 628, 639, 85 S.Ct. 1731.) However, in Linkletter the court stated, at page 639, 85 S.Ct. at page 1743: "Finally, in each of the three areas in which we have applied our rule retrospectively the principle that we applied went to the fairness of the trial—the very integrity of the fact-finding process. Here * * * the fairness of the trial is not under attack. All that petitioner attacks is the admissibility of evidence, the reliability and relevancy of which is not questioned and which may well have no effect on the outcome."

■ There is no question that Kerrigan had a fair trial. He never claimed otherwise. There is no question as to the relevancy and reliability of the evidence admitted in Kerrigan's trial. As I view it, there is no sufficient reason to differentiate between Mapp and Escobedo in respect to retroactivity. The purposes of the rules in Mapp and Escobedo are parallel.

The Supreme Court also stated in Linkletter (381 U.S. page 637, 85 S.Ct. page 1742): "Finally, there are interests in the administration of justice and the integrity of the judicial process to consider. To make the rule of Mapp retrospective would tax the administration of justice to the utmost. * * * To thus legitimate such an extraordinary procedural weapon that has no bearing on guilt would seriously disrupt the administration of justice." These observations, I believe, apply equally to the retroactivity of Escobedo. To apply Escobedo broadly retroactive in all circumstances would invalidate many state and federal convictions. (In re Lopez, supra)

Since Kerrigan's conviction was final on February 28, 1963, this Court rules the Escobedo rule cannot be applied retrospectively to Kerrigan's case and adds an alternative ground upon which the petitioner here cannot prevail.

Writ denied and petition dismissed.