John Joseph **KERRIGAN**, Petitioner, Appellant,

v.

**Palmer C. SCAFATI**, Superintendent, Massachusetts Correctional Institution, Walpole, Respondent, Appellee.

No. 6677.

United States Court of Appeals First Circuit.

Heard April 7, 1966.

Decided July 20, 1966.

See also 1 Cir., 348 F.2d 187.

William E. O'Halloran, Newtonville, for appellant.

Richard S. Kelley, Asst. Dist. Atty., with whom John J. Droney, Dist. Atty. and Ruth I. Abrams and Aaron K. Bikofsky, Asst. Dist. Attys., were on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

Petitioner seeks a writ of habeas corpus to reverse his conviction for murder. After a lengthy history of prior litigation,[1] he charges that fatal error was committed by receiving into evidence statements, exculpatory in intent but inculpatory in fact because of their falsity, which he made to the police without having been advised of his rights to counsel and to silence, in violation of the principles of Escobedo v. State of Illinois, 1965, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977.

The facts are well set forth in detail in the opinion of Judge Ford in 247 F. Supp. 713. We rehearse here as few of them as we think necessary to establish the background for decision.

In September 1960, in the early morning, Cambridge police officer Gorman

1. The Massachusetts state court conviction was affirmed in Commonwealth v. Kerrigan, 1963, 345 Mass. 508, 188 N.E.2d 484. Subsequent denials of motions for new trial were affirmed. 1964, 346 Mass. 786, 196 N.E.2d 190, cert. denied, 377 U.S. 1004, 84 S.Ct. 1943, 12 L.Ed.2d 1054; 1965 Mass.Adv.Sh. 889. Proceedings in the federal courts followed a denial of an application for a stay of execution, made in connection with a petition for certiorari, by Mr. Justice Goldberg. A petition for habeas corpus filed in the district court was denied, and after appeal to this court, remanded for an evidentiary hearing, 1965, 348 F.2d 187. The petition was denied and dismissed after hearing, D.Mass., 1965, 247 F.Supp. 713, and is now before this court on appeal.

was shot and killed. One Cook was arrested and indicted for his murder. Evidence existed that Cook had an unknown companion at the scene. In the afternoon of the same day, petitioner was arrested, brought to the Cambridge Police Station, questioned as to his recent whereabouts and acquaintance with Cook,[2] held overnight, and released. Informed that he could use a telephone to call a lawyer, he declined and, instead, called his sister who came to meet him on his release.

Seven months later, in April 1961, petitioner was arrested by the Boston police, on suspicion of a loan company robbery, taken to the police station, questioned, and released on the same day. With petitioner when arrested was one Fratus, whom petitioner introduced to the police under another name. Again petitioner had been informed that he could telephone a lawyer but declined to do so.

On May 14, 1961, Cook, still awaiting trial for the Gorman murder, and another prisoner escaped from jail, in the course of which Cambridge deputy jail master Robinson was killed. On May 17, Fratus told the police that, earlier that day, petitioner had brought Cook to his (Fratus') apartment. When the police tried to enter, Cook fatally shot himself.

The same evening, at about 9 p. m., police officers called at petitioner's home and, guns drawn, arrested and handcuffed him, took him to Fratus' apartment, and then (at about 10 p. m.) to Boston Police Headquarters. He was there booked on suspicion of being an accessory after the fact to Robinson's murder. He was fingerprinted and photographed. At this time his attention was called to a placard on the door five feet away from him entitled: "Attention! All Persons Under Arrest Read This Notice". The subtitle in smaller block letters read: "Right to use telephone by persons under arrest". And, in smaller print, a Massachusetts statute was quoted, which instructed the police official in charge of the station to permit use of the telephone to call family or friends, to arrange for bail, or to engage the services of a lawyer. The law also stated that this instruction was to be given immediately on booking and that the permission should extend for one hour. Petitioner was told to read it. He looked at the notice but made no comment.

Between 10 p. m. and 10:30 p. m., petitioner did use the telephone to call a friend of his sister, stating that he was all right, that it was "the same thing as before", that he did not need a lawyer, and that he would be home "after the line-up" in the morning.

At 11:55 p. m. petitioner was received at the Boston City Jail. At 2:30 a. m. he was questioned for three quarters of an hour by a captain of the State Police, who had been assigned to the Robinson murder.

At 8:10 a. m. the next morning, May 18, petitioner appeared in a line-up with others, including another accessory after the fact suspect. Petitioner told an officer that he understood this was also the charge on which he was booked, to which the officer replied that petitioner had, the day before, been observed in Cook's company.

At 11 a. m. petitioner was delivered to the Cambridge Police Station, talked for about ten minutes with his two sisters, gave one of them twenty dollars for taxi fares, and asked her to get in touch with Paul Smith, a Boston attorney.[3]

2. Petitioner had known Cook while both were serving sentences at Walpole Correctional Institution. The police believed that he had been in touch with Cook after their discharge.

3. The sister testified that, on contacting Smith, she was referred to an Attorney Bobrich, now deceased. This attorney subsequently told her that he had called someone at the police station, and was informed that petitioner was being questioned. The police testified that, while sometime during the afternoon they learned that Bobrich was representing petitioner, they knew of no effort to see petitioner until he walked into the courtroom to be arraigned at about 5 p. m. On this state of the evidence, supplemented by petitioner's later specific (*infra*) acknowledgement that he knew he could stop the proceedings by ask-

Petitioner was then questioned for from forty minutes to an hour in the presence of several officers. The entire conversation was recorded on tape. The questioning related to petitioner's relationship with Cook and his whereabouts from May 13 to his arrest on the 17th. Petitioner reserved to himself the right to determine whether questions were pertinent.[4] At one point petitioner said he had hardly closed his eyes since the preceding night, adding, "And, you know, if I had an idea, I'd make arrangements to get a lawyer or what have you. I want to get this expedited one way or the other." At this his interrogator said, "John if you think you need one—", to which petitioner replied "It's not that I need one. I don't even want to give him a dollar. I don't know how long it's going to take you to check me out."

At 3:40 p. m. petitioner stood in another line-up with twelve other persons and was asked to say "Come on, let's get out of here" in the presence of an observer—who had seen Cook with someone the day before the Gorman murder. Police also took at this time a sample of petitioner's hair.

Finally, at 4:25 p. m., petitioner was brought into confrontation with Fratus, his informer. The avowed purpose of the police was to try to test, through observing petitioner's reaction, the truth of Fratus's story about petitioner having brought Cook to his home. Seven officials were present and a stenographic record was made. Petitioner, being asked if he knew Fratus, replied, "Well, I can't say yes or no". Fratus then told of seeing petitioner come to his apartment with Cook. Petitioner, asked what he had to say to this,

said, "I don't say nothing to it", and shortly, saying that he was "not familiar with this routine", asked if he could have an attorney present. Told that he could call his attorney, he made no effort to do so, and in fact continued to answer a few more questions on ground which had previously been covered.

Petitioner was thereupon arraigned on the accessory after the fact charge. Three days later Fratus for the first time connected petitioner with Gorman's murder by relating a conversation he had heard between petitioner and Cook—the first such evidence the police had received. He was promptly indicted for this murder, and subsequently tried and convicted.

At trial, officers testified without objection as part of the government's case to a number of statements petitioner had made in the course of the above interrogations. They concerned his activities between May 14 and his arrest and his denying having seen Cook or knowing Fratus. Petitioner took the stand and on cross-examination admitted that many statements made by him to the police had been false.

Petitioner was 41 years old, had served 3 years in Walpole Correctional Institute, and 9 years in Charlestown State Prison, had been convicted in 1947 for armed robbery and other crimes, and had been arrested a total of approximately ten times. While at Walpole he was chairman of the inmate council, helping run several organizations and assisting in the processing of new prisoners. At the time of the events detailed here, he was employed as a longshoreman.

The district court found (1) that the several police interrogations above set

---

ing for an attorney, we cannot hold that there was a denial of either a request for counsel or a request by counsel to see petitioner.

4. At the outset of this interrogation, the following colloquy took place:
   "Q. Well, John, as you know, you have gone through this many times before.
   "A. Not too many. Probably three times.

"Q. This is going to be a questioning period, and, of course—
   "A. If it's pertinent.
   "Q. We hope that you'll—
   "A. If it's pertinent.
   "Q. We hope—
   "A. If it's pertinent—as long as it's pertinent I will talk to you but, otherwise, I'm not going to talk about anything that is not pertinent to this investigation."

forth were investigatory rather than accusatory (since petitioner was not then suspected of any connection with the Gorman murder and was only linked to the Robinson murder as an accessory by Fratus's statement); and (2) that while petitioner was not expressly told that he had a right to counsel or a right to remain silent, he was fully aware of his rights. The court therefore concluded that the principles of *Escobedo* were not infringed, and that the use of petitioner's exculpatory but false statements at trial did not deprive him of any constitutional rights.

We have an advantage not enjoyed by the district court—the recent decisions of the Supreme Court, Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (6/13/66); Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed. 2d 882 (6/20/66); and Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (6/20/66). It is clear that *Escobedo* does not apply, both because no request to consult with counsel was made and refused, and because *Escobedo* is not operative retrospectively. Johnson v. New Jersey, supra. It is also clear that, while the several specific procedural standards set forth in *Miranda* were not all observed, these also are prospective. Johnson v. New Jersey, supra.

■ Our task, therefore, is to apply a "substantive test of voluntariness", drawing on pre-*Escobedo* and pre-*Miranda* case law on coerced confessions, to determine whether petitioner in this case has been "found guilty by trustworthy evidence in conformity with previously announced constitutional standards." Johnson v. New Jersey, supra.

■ Although the petitioner's statements utilized in his trial were not a confession but were intended to be exculpatory, we apply the same test of voluntariness to which a confession would be subjected. Applying this test, we cannot say that the statements of petitioner were the products of coercion. The drama that played itself out in the Boston and Cambridge police stations was between two

experienced actors, each with a calculated strategy. The police, armed with information from Fratus that petitioner had brought Cook to his apartment, had everything to gain and nothing to lose from a lengthy and leisurely interrogation of petitioner. He would either have to incriminate himself directly by confession or, equally helpful, by constructing a vulnerable edifice of lies. In either event the trap was laid. Fratus had been proven reliable for he had led the police to Cook's hiding place.

We dismiss as disingenuous the avowed police interest in checking the veracity of Fratus' information. In post-*Escobedo* terms, the process had already turned accusatory. If the purpose had been a normal attempt to "check out" one suspect among several, there would have been little reason to retain petitioner for twenty hours, subject him to one informal interrogation, two line-ups, one taped interview, and a carefully staged confrontation with a key adverse witness.

On the other hand, petitioner had his own strategy. Not only was he not "a novice" as we said in White v. Hancock, 1 Cir., 1966, 355 F.2d 262, but he had served twelve years in two penal institutions, had been arrested some ten times, and had displayed qualities of leadership while in prison. More to the precise point, he had recently been arrested, held, and questioned on two occasions in seven months. On each occasion he had been "checked out" (i. e., interrogated, cleared, and released) without the aid of a lawyer.

So, on May 17, on arriving at the police station, he called his sister's friend and confidently predicted his release in the morning, specifically saying that he did not need a lawyer. Early the next morning he knew what he was contending with—some evidence that he had been seen with Cook the day before. But he still did not request counsel. He asked his sister to see his lawyer, but he made no move to stop the proceedings until the lawyer arrived—something which he knew how to do, as he later demonstrated. Even in the middle of the afternoon ques-

tioning, after he had raised the subject of a lawyer, he was quick to discard it.

It was only when he recognized that he had been caught in a lie—that of denying his acquaintance with Fratus—that his confidence disappeared. For it was petitioner who had introduced Fratus to the police when they had arrested him a month earlier.

The drama, apart from the fact that the interrogation was extended, was devoid of indicia of coercion. Although petitioner hardly needed the reminder, the placard announcing his right to contact counsel by telephone was initially pointed out to him. He used the telephone shortly after being brought into custody. Although questioning continued until a late hour, there is no suggestion at any point that his "will was overborne". Davis v. North Carolina, supra. There is no evidence of deprivation of food, violence, or hostile threats. The attitude of officers was mild. Undoubtedly this was dictated by strategy rather than charity, but it still cannot, under these circumstances, be equated with coercion. In the final tape-recorded interview petitioner in essence dictated the ground rules of the interrogation.

Our review of the relevant case law reveals no set of circumstances such as these where the product of the in-custody interrogation was held to be the result of "a will overborne".[5]

Certainly the cases resting in some part on the experience, capacity, or condition of the defendant are not applicable. Davis v. North Carolina, 1966, 384 U.S. 737, 86 S.Ct. 1761, (6/20/66) (impoverished Negro with third or fourth grade education); Townsend v. Sain, 1963, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (19 year old drug addict under possible influence of a "truth serum"); Gallegos v. State of Colorado, 1962, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (14 year old boy, "unlikely to have any conception of what will confront him", kept incommunicado for five days); Reck v. Pate, 1961, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (19 year old high grade mental defective, sick, hungry, kept eight days, questioned for six and seven hours at a time); Blackburn v. State of Alabama, 1959, 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (one hundred per cent mental incompetent probably "insane" at time of confession); Fikes v. State of Alabama, 1957, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 ("highly suggestible" uneducated defendant of low mentality). Petitioner in this case is more aptly described in the language of Stein v. People of State of New York, 1953, 346 U.S. 156, 185–186, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522, regarding the defendants in that case: "not young, soft, ignorant or timid. They were not inexperienced in the ways of crime or its detection, nor were they dumb as to their rights."

Nor do the circumstances in this case reflect the atmosphere of coercion (based on inducement, trickery, force, threats, or deprivation of necessities) revealed in either the cases we have cited above or the following: Jackson v. Denno, 1964, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (pain, absence of water, drugs, threats); Haynes v. State of Washington, 1963, 373 U.S. 503, 83 S.Ct. 1336, 10 L. Ed.2d 513 (defendant denied opportunity to see wife or counsel until he "cooperated"); Spano v. People of State of New York, 1959, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (denial of counsel, fatigue, "sympathy falsely aroused" by officer friend); Watts v. State of Indiana, 1949, 338 U.S. 49 (defendant put in solitary two days, held six days, questioning from 6 p. m. to 3 a. m. each day, insufficient food and sleep); Turner v. Commonwealth of Pennsylvania, 1949, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (twenty hours of questioning in relays, five days incommunicado, false statement given defendant that others had "opened up" on

---

5. See also the review of the authorities in "Developments in the Law—Confessions", 79 Harv.L.Rev. 935–1119 (1965). Most relevant to the issue here dealt with is the discussion on "Due Process and 'Free and Rational Choice'", 79 Harv. L.Rev., op. cit. supra, at 973–981.

him); Ashcraft v. State of Tennessee, 1944, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (36 hours of questioning in same room, under bright light, with one 5 minute respite); Chambers v. State of Florida, 1940, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (fear of mob violence, questioning for several days and nights, all night vigil on last night before confession); Brown v. State of Mississippi, 1936, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 ("extreme brutality").

We are persuaded that the situation in the case at bar falls substantially short of that described in all of the above cases. We are fully aware that determining voluntariness, or the lack of it, is not a matter of "color-matching" the instant case with earlier ones. Reck v. Pate, supra, 367 U.S. at 442, 81 S.Ct. 1541. But we cannot find in the teachings or holdings of these pre-*Escobedo* and pre-*Miranda* cases a basis for holding that there was such coercion here as to violate the "previously announced constitutional standards". Johnson v. New Jersey, supra. We conclude that petitioner's statements while in custody were "the product of a rational intellect and a free will". Blackburn v. State of Alabama, supra, 361 U.S. at 208, 80 S.Ct. at 280.

Affirmed.