# DAVIS *v.* NORTH CAROLINA.

No. 815. Argued April 28, 1966.—Decided June 20, 1966.

*Charles V. Bell* argued the cause for petitioner. With him on the brief were *Walter B. Nivens* and *Calvin Brown.*

*James F. Bullock,* Assistant Attorney General of North Carolina, argued the cause for respondent. With him on the brief was *T. W. Bruton,* Attorney General.

Opinion of the Court by MR. CHIEF JUSTICE WARREN, announced by MR. JUSTICE BRENNAN.

Petitioner, Elmer Davis, Jr., was tried before a jury in the Superior Court of Mecklenburg County, North Carolina, on a charge of rape-murder. At trial, a written confession and testimony as to an oral confession were offered in evidence. Defense counsel objected on the ground that the confessions were involuntarily given. The trial judge heard testimony on this issue, ruled that the confessions were made voluntarily, and permitted them to be introduced in evidence. The jury returned a verdict of guilty without. a recommendation for life imprisonment, and Davis was sentenced to death.

The conviction was affirmed on appeal by the Supreme Court of North Carolina, 253 N. C. 86, 116 S. E. 2d 365, and this Court denied certiorari. 365 U. S. 855. Davis then sought a writ of habeas corpus in the United States District Court for the Eastern District of North Carolina. The writ was denied without an evidentiary hearing on the basis of the state court record. 196 F. Supp. 488.

On appeal, the Court of Appeals for the Fourth Circuit reversed and remanded the case to the District Court for an evidentiary hearing on the issue of the voluntariness of Davis' confessions. 310 F. 2d 904. A hearing was held in the District Court, following which the District Judge again held that the confessions were voluntary. 221 F. Supp. 494. The Court of Appeals for the Fourth Circuit, after argument and then resubmission *en banc,* affirmed with two judges dissenting. 339 F. 2d 770. We granted certiorari. 382 U. S. 953.

We are not called upon in this proceeding to pass on the guilt or innocence of the petitioner of the atrocious crime that was committed. Nor are we called upon to determine whether the confessions obtained are true or false. *Rogers* v. *Richmond,* 365 U. S. 534 (1961). The sole issue presented for review is whether the confessions were voluntarily given or were the result of overbearing by police authorities. Upon thorough review of the record, we have concluded that the confessions were not made freely and voluntarily but rather that Davis' will was overborne by the sustained pressures upon him. Therefore, the confessions are constitutionally inadmissible and the judgment of the court below must be reversed.

Had the trial in this case before us come after our decision in *Miranda* v. *Arizona, ante,* p. 436, we would reverse summarily. Davis was taken into custody by Charlotte police and interrogated repeatedly over a period of 16 days. There is no indication in the record that police advised him of any of his rights until after he had confessed orally on the 16th day.[1] This would

---

[1] The written confession which Davis subsequently signed contained a notation that he was advised he did not have to make a statement and that any statement made could be used for or against him in court. A police officer testified at trial that he told Davis if the statement was not the truth he did not have to sign it.

be clearly improper under *Miranda. Id.,* at 478–479, 492. Similarly, no waiver of rights could be inferred from this record since it shows only that Davis was repeatedly interrogated and that he denied the alleged offense prior to the time he finally confessed. *Id.,* at 476, 499.

We have also held today, in *Johnson* v. *New Jersey, ante,* p. 719, that our decision in *Miranda,* delineating procedures to safeguard the Fifth Amendment privilege against self-incrimination during in-custody interrogation is to be applied prospectively only. Thus the present case may not be reversed solely on the ground that warnings were not given and waiver not shown. As we pointed out in *Johnson,* however, the nonretroactivity of the decision in *Miranda* does not affect the duty of courts to consider claims that a statement was taken under circumstances which violate the standards of voluntariness which had begun to evolve long prior to our decisions in *Miranda* and *Escobedo* v. *Illinois,* 378 U. S. 478 (1964). This Court has undertaken to review the voluntariness of statements obtained by police in state cases since *Brown* v. *Mississippi,* 297 U. S. 278 (1936). The standard of voluntariness which has evolved in state cases under the Due Process Clause of the Fourteenth Amendment is the same general standard which applied in federal prosecutions—a standard grounded in the policies of the privilege against self-incrimination. *Malloy* v. *Hogan,* 378 U. S. 1, 6–8 (1964).

The review of voluntariness in cases in which the trial was held prior to our decisions in *Escobedo* and *Miranda* is not limited in any manner by these decisions. On the contrary, that a defendant was not advised of his right to remain silent or of his right respecting counsel at the outset of interrogation, as is now required by *Miranda,* is a significant factor in considering the voluntariness of statements later made. This factor has been recognized in several of our prior decisions

dealing with standards of voluntariness. *Haynes* v. *Washington,* 373 U. S. 503, 510–511 (1963); *Culombe* v. *Connecticut,* 367 U. S. 568, 610 (1961); *Turner* v. *Pennsylvania,* 338 U. S. 62, 64 (1949). See also *Gallegos* v. *Colorado,* 370 U. S. 49, 54, 55 (1962). Thus, the fact that Davis was never effectively advised of his rights gives added weight to the other circumstances described below which made his confessions involuntary.

As is almost invariably so in cases involving confessions obtained through unobserved police interrogation, there is a conflict in the testimony as to the events surrounding the interrogations. Davis alleged that he was beaten, threatened, and cursed by police and that he was told he would get a hot bath and something to eat as soon as he signed a statement. This was flatly denied by each officer who testified.[2] Davis further stated that he had repeatedly asked for a lawyer and that police refused to allow him to obtain one. This was also denied. Davis' sister testified at the habeas corpus hearing that she twice came to the police station and asked to see him, but that each time police officers told her Davis was not having visitors. Police officers testified that, on the contrary, upon learning of Davis' desire to see his sister, they went to her home to tell her Davis wanted to see her, but she informed them she was busy with her children. These factual allegations were resolved against Davis by the District Court and we need not review these specific findings here.

It is our duty in this case, however, as in all of our prior cases dealing with the question whether a confession was involuntarily given, to examine the entire record

---

[2] The State adds in its brief: "Surely, Davis was not such a sensitive person, after all his years in prison, that 'cussing' and being called 'Nigger' constituted any degree of fear or coercion." Brief for Respondent, p. 8.

and make an independent determination of the ultimate issue of voluntariness. *E. g., Haynes* v. *Washington,* 373 U. S. 503, 515–516 (1963); *Blackburn* v. *Alabama,* 361 U. S. 199, 205 (1960); *Ashcraft* v. *Tennessee,* 322 U. S. 143, 147–148 (1944). Wholly apart from the disputed facts, a statement of the case from facts established in the record, in our view, leads plainly to the conclusion that the confessions were the product of a will overborne.

Elmer Davis is an impoverished Negro with a third or fourth grade education. His level of intelligence is such that it prompted the comment by the court below, even while deciding against him on his claim of involuntariness, that there is a moral question whether a person of Davis' mentality should be executed. Police first came in contact with Davis while he was a child when his mother murdered his father, and thereafter knew him through his long criminal record, beginning with a prison term he served at the age of 15 or 16.

In September 1959, Davis escaped from a state prison camp near Asheville, North Carolina, where he was serving sentences of 17 to 25 years. On September 20, 1959, Mrs. Foy Belle Cooper was raped and murdered in the Elmwood Cemetery in the City of Charlotte, North Carolina. On September 21, police in a neighboring county arrested Davis in Belmont, 12 miles from Charlotte. He was wearing civilian clothes and had in his possession women's undergarments and a billfold with identification papers of one Bishel Buren Hayes. Hayes testified at trial that his billfold and shoes had been taken from him while he lay in a drunken sleep near the Elmwood Cemetery on September 20.

Charlotte police learned of Davis' arrest and contacted the warden of the state prison to get permission to take Davis into their custody in connection with the Cooper murder and other felonies. Having obtained permission,

they took Davis from Belmont authorities and brought him to the detective headquarters in Charlotte. From the testimony of the officers, it is beyond dispute that the reason for securing Davis was their suspicion that he had committed the murder.[3]

The second and third floors of the detective headquarters building contain lockup cells used for detention overnight and occasionally for slightly longer periods. It has no kitchen facilities for preparing meals. The cell in which Davis was placed measures 6 by 10 feet and contains a solid steel bunk with mattress, a drinking fountain, and a commode. It is located on the inside of the building with no view of daylight. It is ventilated by two exhaust fans located in the ceiling of the top floor of the building. Despite the fact that a county jail equipped and used for lengthy detention is located directly across the street from detective headquarters, Davis was incarcerated in this cell on an upper floor of the building for the entire period until he confessed.[4] Police Chief Jesse James testified: "I don't know anybody who has stayed in the city jail as long as this boy."

When Davis arrived at the detective headquarters, an arrest sheet was prepared giving various statistics con-

---

[3] Some of the officers testified that they had no idea why Davis was being brought to Charlotte except as an escapee or in relation to the stolen goods in his possession. Captain McCall, who was in charge of the entire detective division of the Charlotte Police, stated at trial, however: "He was brought over here for the purpose of being an escaped convict and as a likely suspect in the murder case . . . . We were not holding him for the State when he was in Gaston County jail, but were making an investigation in reference to our murder case." At the habeas corpus hearing, he testified: "[H]e was in our custody primarily because he was a suspect in Mrs. Cooper's case . . . ." Davis' prior offenses included an assault in the vicinity of the cemetery, and his home had been nearby. See also note 9, infra.

[4] The only exception to this incarceration was a day spent near Asheville, described infra, and a night in the Asheville jail.

cerning him. On this arrest sheet was typed the following illuminating directive: "HOLD FOR HUCKS & FESPERMAN RE-MRS. COOPER. ESCAPEE FROM HAYWOOD COUNTY STILL HAS 15 YEARS TO PULL. DO NOT ALLOW ANYONE TO SEE DAVIS. OR ALLOW HIM TO USE TELEPHONE." Both at trial and at the habeas corpus hearing the testimony of police officers on this notation was nearly uniform. Each officer testified that he did not put that directive on the arrest sheet, that he did not know who did, and that he never knew of it. The police captain first testified at trial that there had never been an order issued in the police department that Davis was not to see or talk to anybody. He cited as an example the fact that Davis' sister came to see him (after Davis had confessed). He testified later in the trial, however:

> "I don't know, it is possible I could have ordered this boy to be held without privilege of communicating with his friends, relatives and held without the privilege of using the telephone or without the privilege of talking to anybody. . . . No, I did not want him to talk to anybody. For the simple reason he was an escaped convict and it is the rules and regulations of the penal system that if he is a C grade prisoner he is not permitted to see anyone alone or write anyone letters and I was trying to conform to the state regulations." [5]

---

[5] Transcript of Evidence on Appeal. His testimony at the habeas corpus hearing was very similar. He first stated somewhat confusingly:

"Inasmuch as he was an escaped convict, I would have asked them what was the purpose of placing this do not allow anyone to see Davis or allow him to use the telephone. To be perfectly honest with you, why put it in writing when you can do the same thing verbally. I mean there is no question about it. The question is that

The District Court found as a fact that from September 21 until after he confessed on October 6, neither friend nor relative saw Davis. It concluded, however, that Davis was not held incommunicado because he would have been permitted visitors had anyone requested to see him. In so finding, the District Court noted specifically the testimony that police officers contacted Davis' sister for him. But the court made no mention whatever of the notation on the arrest sheet or the testimony of the police captain.

The stark wording of the arrest sheet directive remains, as does Captain McCall's testimony. The denials and evasive testimony of the other officers cannot wipe this evidence from the record. Even accepting that police would have allowed a person to see Davis had anyone actually come, the directive stands unassailably as an indicium of the purpose of the police in holding Davis. As the dissenting judges below stated: "The instruction not to permit anyone access to Davis and not to allow him to communicate with the outside world can mean only that it was the determination of his custodians to keep him under absolute control where they could subject him to questioning at will in the manner and to the extent they saw fit, until he would confess." 339 F. 2d, at 780. Moreover, the uncontested fact that *no one* other than the police spoke to Davis during the 16 days of detention and interrogation that preceded his

---

each individual is allowed due process of law. And if they had been asked in any way or if I had been asked for anyone to see Elmer, they would have been given permission. Nobody asked to my knowledge."

He later testified:

"I didn't want anybody to talk to him without me knowing it as he was a prisoner of the State of North Carolina, and he was a C grade prisoner and not entitled to visitors without the permission of the warden."

confessions is significant in the determination of voluntariness.

During the time Davis was held by Charlotte police, he was fed two sandwiches, described by one officer as "thin" and "dry," twice a day. This fare was occasionally supplemented with peanuts and other "stuff" such as cigarettes brought to him by a police officer.[6] The District Court found that the food was the same served prisoners held overnight in the detention jail and that there was no attempt by police to weaken Davis by inadequate feeding. The State contends that "two sandwiches twice a day supplemented by peanuts 'and other stuff' was not such a poor diet, for an idle person doing no work, as to constitute a violation of due process of law." Brief for Respondent, p. 7.

We may readily agree that the record does not show any deliberate attempt to starve Davis, compare *Payne v. Arkansas,* 356 U. S. 560 (1958), and that his diet was not below a minimum necessary to sustain him. Nonetheless, the diet was extremely limited and may well have had a significant effect on Davis' physical strength and therefore his ability to resist. There is evidence in the record, not rebutted by the State, that Davis lost 15 pounds during the period of detention.

From the time Davis was first brought to the overnight lockup in Charlotte on September 21, 1959, until he confessed on the 16th day of detention, police officers conducted daily interrogation sessions with him in a special interrogation room in the building.[7] These sessions each

---

[6] During the 16-day period, this diet varied only for two meals on the day he was taken to Asheville and on one other occasion when an officer brought him two hamburgers.

[7] As the Police Chief explained: "An interrogation room should be void of all materials so that you can talk to a man in complete quiet and keep his attention."

lasted "forty-five minutes or an hour or maybe a little more," according to one of the interrogating officers. Captain McCall testified that he had assigned his entire force of 26 to 29 men to investigate the case. From this group, Detectives Hucks and Fesperman had primary responsibility for interrogating Davis. These officers testified to interrogating him once or twice each day throughout the 16 days. Three other officers testified that they conducted several interrogation sessions at the request of Hucks and Fesperman. Although the officers denied that Davis was interrogated at night, one testified that the interrogation periods he directed were held some time prior to 11 p. m.[8] Captain McCall also interrogated Davis once.

According to each of the officers, no mention of the Cooper murder was made in any of the interrogations between September 21 and October 3. Between these dates they interrogated Davis extensively with respect to the stolen goods in his possession. It is clear from the record, however, that these interrogations were directly related to the murder and were not simply questioning as to unrelated felonies. The express purpose of this line of questioning was to break down Davis' alibis as to where he had obtained the articles. By destroying Davis' contention that he had taken the items from homes some

---

[8] After the officer admitted that the sessions might have been up to 11 p. m., the following question was posed and answered:

"Q. Well, he could have been interrogated by you at night, couldn't he?

"A. I'll say no and I'll say yes."

Another officer testified as follows:

"Q. At the time you interrogated him up in the Police Department, was it daylight or dark?

"A. Well, it could have been both, if I remember correctly. I'll just leave it that way: it could have been both, because that's the way it is."

distance from Charlotte, Davis could be placed at the scene of the crime.[9]

In order to put pressure on Davis with respect to these alibis, police took him from the lockup on October 1 to

[9] Further graphic evidence of the obvious purpose of the police in detaining and repeatedly interrogating Davis is found in statements made to the press during this period:

"Detective Capt. W. A. McCall said Davis had not implicated himself in the Sunday slaying.

" 'We're still talking to him,' he said." Charlotte Observer, Sept. 23, 1959, B–1.

"A Negro man was seen crouching in the bushes at Elmwood Cemetery shortly before the rape-slaying of an elderly widow there Sunday afternoon, Charlotte detectives said Wednesday.

. . . . .

"Charlotte detectives . . . continued interrogating E. J. Davis, the escapee who was arrested in Belmont Monday night.

. . . . .

" 'We questioned him twice today,' Capt. McCall said Wednesday night. 'He has given us some conflicting information, and we're checking all his alibis.'

" 'We'll give him a lie detector test if necessary. But so far we have had no positive results from our interrogation.' " Charlotte Observer, Sept. 24, 1959, B–1.

" 'Everybody . . . everybody is a suspect in this case until we sign a murder warrant.'

"Detective Capt. W. A. McCall spoke these words Thursday as police continued their search for the man who killed and raped a 78-year-old widow in a local graveyard Sunday afternoon.

. . . . .

"But the main emphasis Thursday continued to be on E. J. Davis, a 32-year-old Negro prison escapee who was convicted of raping an elderly woman here in 1949.

"Davis was questioned at length Thursday for the third straight day.

" 'We know he's telling us some lies,' Capt. McCall said. 'We're checking every alibi and every story he gives us, and some of them just aren't true.

" 'We don't have enough facts yet to give him a lie detector test, though.' " Charlotte Observer, Sept. 25, 1959, B–1.

"Being questioned presently in connection with the slaying of 78-year-old Mrs. Foy Belle Cooper is E. J. Davis, a 32-year-old

have him point out where he had stolen the goods. Davis had told the officers that he took the items from houses along the railroad line between Canton and Asheville. To disprove this story, Davis was aroused at 5 a. m. and driven to Canton. There his leg shackles were removed and he walked on the railroad tracks, handcuffed to an officer, 14 miles to Asheville. When Davis was unable to recognize any landmark along the way or any house that he had burglarized, an officer confronted him with the accusation that his story was a lie. The State points out that Davis was well fed on this day, that he agreed to make the hike, and contends that it was not so physically exhausting as to be coercive. The coercive influence was not, however, simply the physical exertion of the march, but also the avowed purpose of that trek—to break down his alibis to the crime of murder.

On the afternoon of October 3, two officers planned and carried out a ruse to attempt to get Davis to incriminate himself in some manner. They engaged Davis in idle conversation for 10 to 20 minutes and then inquired whether he would like to go out for "some fresh air." They then took Davis from the jail and drove him into

Negro escapee who was arrested Monday in Belmont. Davis has a prior record for rape in 1949." Charlotte Observer, Sept. 26, 1959, B–1.

"Charlotte detectives concentrated Monday on a 32-year-old escaped convict in an effort to find who raped and murdered a 78-year-old widow here a week ago.

.        .        .        .        .

"Davis has been questioned closely several times in connection with the rape-slaying of Mrs. Foy Belle Cooper, 78." Charlotte Observer, Sept. 29, 1959, 14–A.

"City detectives were still probing a man's alibis for loopholes Friday in an investigation into the rape-slaying of a 78-year-old white woman in Charlotte Sept. 20.

"The suspect is an escaped convict, E. J. Davis. . . ." Charlotte Observer, Oct. 3, 1959, B–1.

the cemetery to the scene of the crime in order to observe his reaction.

The purpose of these excursions and of all of the interrogation sessions was known to Davis. On the day of the drive to the cemetery, the interrogators shifted tactics and began questioning Davis specifically about the murder.[10] They asked him if he knew why he was being held. He stated that he believed it was with respect to the Cooper murder. Police then pressed him, asking, "Well, did you do it?" He denied it. The interrogation sessions continued through the next two days. Davis consistently denied any knowledge of the crime.[11]

On October 6, Detectives Hucks and Fesperman interrogated Davis for the final time. Lieutenant Sykes, who had known Davis' family, but who had not taken part in any of the prior interrogation sessions because he had been away on vacation, asked to sit in. During this interrogation, after repeated earlier denials of guilt, Davis refused to answer questions concerning the crime. At about 12:45 p. m., Lieutenant Sykes inquired of Davis if he would like to talk to any of the officers alone about Mrs. Cooper. Davis said he would like to talk to Sykes. The others left the room. Lieutenant Sykes then asked Davis if he had been reading a testament which he was holding. Davis replied that he had. Sykes asked Davis if he had been praying. Davis replied that he did not know how to pray and agreed he would like Sykes to pray for him. The lieutenant offered a short

[10] Although the District Court found that police did not interrogate Davis directly about the Cooper case until October 3, the testimony was not uniform on this point. There is testimony in the record by police officers that the first interrogation about the murder was on the Friday before he confessed—October 2, 1959. See 253 N. C. 86, 90, 116 S. E. 2d 365, 367. See also Charlotte Observer, Oct. 7, 1959, A–1, Oct. 8, 1959, B–1.

[11] Although the record does not show the tenor of the interrogation on October 4, it is established that Davis was interrogated every day and that he denied any connection with the crime until October 6.

prayer. At that point, as the dissent below aptly put it, the prayers of the police officer were answered—Davis confessed. He was driven to the cemetery and asked to re-enact the crime. Police then brought him back to the station where he repeated the confession to several of the officers. In the presence of six officers, a two-page statement of the confession Davis had made was transcribed. Although based on the information Davis had given earlier, Captain McCall dictated this statement employing his own choice of format, wording, and content. He paused periodically to ask Davis if he agreed with the statement so far. Each time Davis acquiesced. Davis signed the statement.[12] Captain McCall then contacted the press and stated, "He finally broke down today." [13]

The concluding paragraphs of this confession, dictated by the police, contain, along with the standard disclaimer that the confession was free and voluntary, a statement that unwittingly summarizes the coercive effect on Davis of the prolonged period of detention and interrogation. They read:

> "In closing, I want to say this. I have known in my own mind that [sic] you people were holding me for, and all the time I have been lying in jail, it has been worrying me, and I knew that sooner or later, I would have to tell you about it.
>
> "I have made this statement freely and voluntarily. Captain McCall has dictated this statement

---

[12] After Davis signed the written confession, Police Chief Jesse James appeared to question Davis about his treatment. In response to this questioning, Davis stated that he had been treated all right. The following morning, a minister who knew Davis' family and had read of his arrest 16 days earlier in the newspaper, appeared to talk to Davis. He testified that Davis told him his treatment had been very fine and that everyone had been courteous and kind to him. The minister indicated further that he often cooperated with police in such matters.

[13] Charlotte Observer, Oct. 7, 1959, A-1-2.

in the presence of Detectives W. F. Hucks, E. F. Fesperman, H. C. Gardner, C. E. Davis, and Detective Lieutenant C. L. Sykes. I am glad it is over, because I have been going thru a big strain."

The facts established on the record demonstrate that Davis went through a prolonged period in which substantial coercive influences were brought to bear upon him to extort the confessions that marked the culmination of police efforts. Evidence of extended interrogation in such a coercive atmosphere has often resulted in a finding of involuntariness by this Court. *E. g., Culombe* v. *Connecticut,* 367 U. S. 568 (1961); *Fikes* v. *Alabama,* 352 U. S. 191 (1957); *Turner* v. *Pennsylvania,* 338 U. S. 62 (1949). We have never sustained the use of a confession obtained after such a lengthy period of detention and interrogation as was involved in this case.

The fact that each individual interrogation session was of relatively short duration does not mitigate the substantial coercive effect created by repeated interrogation in these surroundings over 16 days. So far as Davis could have known, the interrogation in the overnight lockup might still be going on today had he not confessed. Moreover, as we have noted above, the fact that police did not directly accuse him of the crime until after a substantial period of eroding his will to resist by a tangential line of interrogation did not reduce the coercive influence brought to bear upon him. Similarly, it is irrelevant to the consideration of voluntariness that Davis was an escapee from a prison camp. Of course Davis was not entitled to be released. But this does not alleviate the coercive effect of his extended detention and repeated interrogation while isolated from everyone but the police in the police jail.

In light of all of the factors discussed above, the conclusion is inevitable—Davis' confessions were the involuntary end product of coercive influences and are thus constitutionally inadmissible in evidence. Accordingly,

the judgment of the Court of Appeals for the Fourth Circuit must be reversed and the case remanded to the District Court. On remand, the District Court should enter such orders as are appropriate and consistent with this opinion, allowing the State a reasonable time in which to retry petitioner.

*Reversed and remanded.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE CLARK, with whom MR. JUSTICE HARLAN joins, dissenting.

The rationale of the Court's opinion is that Davis, "an impoverished Negro with a third or fourth grade education," was overborne when he gave his confession to the rape-murder.

Davis, a 39-year-old man, admits that he has "been in a lot of jails." The record indicates that his intelligence was far above that of a fourth grader. His own testimony at his trial reveals a highly retentive memory. He described in detail his numerous arrests, convictions, prison sentences, and escapes over a 15-year span. Furthermore, during the federal habeas corpus hearing Davis showed his awareness of legal technicalities. At one point the prosecutor sought to cross-examine Davis as to whether he had "been tried and convicted of various offenses." Despite the fact that there was no objection to the question by his lawyer, Davis turned to the judge and said: "Your Honor, do I have to answer that question? This is in the past." After some argument about the admissibility of the evidence, the judge recessed the hearing for 10 minutes to give counsel an opportunity to present legal authority. Davis' objection was thereafter sustained.

This case goes against the grain of our prior decisions. The Court first confesses that the rule adopted under the Fifth Amendment in *Miranda* v. *Arizona, ante,* p. 436, *i. e.,* that an accused must be effectively advised of

his right to counsel before custodial interrogation, is not retroactive and therefore does not apply to this case. See *Johnson* v. *New Jersey, ante,* p. 719. However, it obtains the same result by reading the Due Process Clause as requiring that heavy weight must be given the failure of the State to afford counsel during interrogation as "a significant factor in considering the voluntariness of statements." Through this change of pace Davis' guilty handwriting is stamped a forgery and his conviction is reversed.

I have found no case dealing with lengthy detention by state officers which supports reversal here. The Court cites three: *Culombe* v. *Connecticut,* 367 U. S. 568 (1961); *Fikes* v. *Alabama,* 352 U. S. 191 (1957); and *Turner* v. *Pennsylvania,* 338 U. S. 62 (1949), all of which were treated in terms of due process. But these cases are clearly distinguishable on their facts with respect to the character of the accused and the circumstances under which interrogation took place. Culombe was a "mental defective of the moron class" who had twice been in state mental institutions. He had no previous criminal record. Fikes was "a schizophrenic and highly suggestible." He had only one prior conviction—for burglary. The interrogation of both these men was more concentrated than that of Davis. Turner was subjected to continual interrogation by a relay of officers, falsely told that others had implicated him, and not permitted to see his family or friends. The prosecutor admitted that his arraignment was delayed, in violation of a state statute, until the police could secure a confession. Turner had no prior criminal record.

On the other hand, Davis had a long criminal record. At the time of his arrest he was an escapee from state prison, and so could be properly held in custody. It is therefore wrong to compare police conduct here to the detention of an ordinary suspect until he confesses. Moreover, the sporadic interrogation of Davis can hardly

be denominated as sustained or overbearing pressure. From the record it appears that he was simply questioned for about an hour each day by a couple of detectives. There was no protracted grilling. Nor did the police officers operate in relays.

The Court makes much of an "arrest sheet" which informed the jailer that Davis was being held in connection with the murder of Mrs. Cooper and that he was an escaped convict. This sheet further directed: "Do not allow anyone to see Davis. Or allow him to use telephone." No witness was able to identify the author of this notation. It is true Captain McCall said that he "might" have done it. But he said that, even so, it was merely a notice to the jailer that Davis was an escapee and, therefore, not permitted to see or talk to anyone. On the contrary, however, the record shows that Davis was not held incommunicado. Upon his request, the police located his sister the second day after his arrest, informed her that Davis was in custody, and on two separate occasions invited her to visit him. The officers first called on his sister for the sole purpose of telling her that Davis wished to see her. A few days later they also asked whether she was missing any of the clothes which were found on Davis. He made no request to see anyone else. Moreover, it is undenied that visitors from churches and schools entered the jail with scripture pamphlets. And Davis had one of these booklets in his hands the day of his confession.

Witnesses testified that Davis had told them that his treatment was "very fine and that everybody was courteous and kind to him." As for the hike of some 14 miles along the railroad tracks, Davis described the purpose of it clearly:

> "Well, we had some clothes and things, what I took up there, and we wanted to go up there and get it straightened out; but the place where I took the stuff I couldn't locate the place because it was at

night, you understand, when I took the clothes and things off the line."

As to the "prayer" of Lieutenant Sykes, there is no testimony whatever that it was in any way "coercive." Indeed, one witness, Davis' preacher, quoted him as saying "that he had nothing but praise for Lieutenant Sykes, especially in the way in which he dealt with him." At another point the parson testified: "Elmer told me that he appreciated the prayer of Lieutenant Sykes." The Court disregards the fact that Davis had a copy of the scriptures in his hands when Sykes came into the room and continued to hold them as they talked. After Sykes—a lay preacher—noticed the testament, it was only natural that the conversation would turn to the scriptures and prayer. Sykes asked if Davis wished him to give a prayer. Davis said that he did, and Sykes prayed with him. The prayer was entirely unsuggestive.

It is said also that the food was not sufficient. But the uncontradicted evidence is that Davis never complained about the meals he received while in custody.* Davis testified that he lost 15 pounds in jail. But this does not warrant a finding that he was improperly fed. No one could contradict or substantiate this contention because the record does not show that his weight was taken upon arrest. And Davis was found to be untruthful in most of his testimony. Indeed, Davis did not paint his treatment with a black brush until his habeas corpus hearing, although he testified at length at his trial in the state court.

Under these circumstances, it appears to me that the trial judge's findings cannot be found to be clearly erroneous. To the contrary, they are fully supported by the entire record. I would affirm.

---

*On the morning that Davis left the jail to walk along the railroad tracks, a police officer asked him "if he was hungry," and his natural reply at that time of day was "yes." The officer then gave Davis breakfast.