UNITED STATES of America ex rel.
Donald JOHNSON, E–7769

v.

A. T. RUNDLE, Supt.

No. 3709.

United States District Court
E. D. Pennsylvania.

June 28, 1968.

Lawrence T. Hoyle, Jr., Philadelphia, Pa., Court-appointed, for relator.

Arlen Specter, Dist. Atty., Welsh S. White, Asst. Dist. Atty., Philadelphia, Pa., for respondent.

## OPINION

JOSEPH S. LORD, III, District Judge.

Relator, a state prisoner, was convicted of rape on November 8, 1957 and is presently incarcerated under a six-and-one-half-to-fifteen-year sentence resulting from that conviction. He now seeks his release by way of federal habeas corpus.

The conviction arose from the events of the evening of September 18, 1957 at which time a 17-year-old white girl was assaulted and raped by a group of Negro boys. On September 20 or 21, relator, having been picked up for questioning in the early evening of the 20th, confessed to his complicity in the attack.

Relator now claims that he is entitled to habeas relief for the following reasons:

1) that his confession was involuntary and therefore its introduction into evidence at his trial wrought a denial of due process;

2) that the introduction into evidence of his "tacit admission" deprived him of due process of law;

3) that the use of his juvenile convictions for impeachment denied him due process of law since those convictions were obtained while he was without the benefit of counsel;

4) that the Commonwealth's insistence on a jury trial after he had attempted to waive it denied him an impartial trial, free from public passion and prejudice;

5) that the absence of counsel at sentencing denied him his right to counsel at a critical stage. This the District Attorney concedes and therefore, at the very least, relator is entitled to be resentenced at a time when he is represented by counsel.

None of relator's claims have, as yet, been passed upon by the state courts. He argues, however, that his failure to exhaust his state remedies is not a bar to relief here since the state has been guilty of inordinate delay. We held a full hearing to consider this and also to hear his substantive claims.

After considering the entire record we hold (1) that because of the excessive delay in the state courts we are justified in proceeding to the merits, and (2) that relator's confession was involuntary and therefore he is entitled to have the writ of habeas corpus granted.[1]

### I. Inordinate Delay

The relator filed for post-conviction relief in the state courts on August 8, 1966. As of March 9, 1968, the date we held our hearing, no decision had as yet been rendered by the state courts on his claims although he had been granted leave to file post-trial motions *nunc pro tunc*. This action was taken on February 1, 1968. However, as of the present date no further action has been taken. The question then is whether relator should be precluded from relief here be-

---

1. Having decided the substantive issue on this ground, we will express no opinion on the other grounds presented.

cause the state courts have not passed on his claims.

■ The "exhaustion doctrine", simply stated, is that a habeas applicant, before being entitled to federal relief, must first pursue those state remedies still open to him at the time he files his petition in the federal court. Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L. Ed.2d 837 (1963).

■ While it is true that non-compliance with this doctrine does not defeat the jurisdiction of the federal courts in these matters, Bowen v. Johnston, 306 U.S. 19, 59 S.Ct. 442, 83 L.Ed. 455 (1939), we do recognize that its practical effect limits, at least initially, the availability of federal habeas corpus.

Despite this limitation it is clear that the "exhaustion doctrine" does serve a valid purpose to the extent that it furthers our notions of federalism. For surely "[i]t would be unseemly in our dual system of government for a federal district court to upset a state conviction without an opportunity to the state courts to correct a constitutional violation. * * *" Darr v. Buford, 339 U. S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1949).

■ Theoretically, of course, the individual will not be disadvantaged by this doctrine since the state courts as well as the federal courts are bound by the strictures of the United States Constitution. And, therefore, any relief available in the federal courts should be equally available in the state courts.

■ Of course, the theoretical premise assumes that the states will allow the individual to present his claims without overly burdensome procedural snarls and to render decisions on them with reasonable dispatch. If the state does not act so, then the effect of the "exhaustion doctrine" would be "to shield an invasion of the citizen's constitutional rights." Jordan v. Hutcheson, 323 F.2d 597, 601 (C.A.4, 1963). And "[i]t is clear that there are sharp limits to the sacrifice men must make upon the alter

of comity." United States ex rel. Lusterino v. Dros, 260 F.Supp. 13 (S.D.N. Y.1966).

Recognizing this, the federal courts have not held the doctrine to be inflexible. In fact 28 U.S.C.A. § 2254, which codifies this doctrine, admits an exception where "such (state corrective) process (is) ineffective to protect the rights of the prisoner."

In Smith v. State of Kansas, 356 F.2d 654 (C.A.10, 1966), the court, confronted with a state court delay of one year, held that since "there is nothing in this record to indicate a disposition to accord the 'swift and imperative remedy' to which he (petitioner) is plainly entitled" the district court could proceed to consider the petitioner's claim. Id. at 657. See also Harvey v. State of Mississippi, 340 F.2d 263 (C.A.5, 1965); United States ex rel. Lusterino v. Dros, supra.

Although we are mindful of the pressure under which state courts labor, we must not overlook the potential for injustice if we sanctioned inordinate delay by refusing to act. Balancing this potential against the desirability of initial state action, many judges are, as their first step, using the practical approach of informally communicating with the state courts and urging them to act promptly. United States ex rel. Rought v. Pike County, 286 F.Supp. 405 (E.D. Pa. Feb. 6, 1968); United States ex rel. Harper v. Rundle, 279 F.Supp. 1013 (E. D.Pa. Dec. 22, 1967). Here, however, all our efforts in this direction have been in vain despite assurances to the contrary.

■ At the time of our hearing there had been a 19-month delay in the state courts. Since our hearing there still has been no adjudication forthcoming. We find this delay to be so inordinate as to justify our proceeding to consider the merits. To do otherwise would be to do indirectly what could not be done directly, i. e., curtail the availability of federal habeas corpus relief to state prisoners.

The District Attorney, however, argues that part of the delay was caused

by the relator. The record does disclose that the Voluntary Defender, who was appointed by the state courts, was under a mistaken impression with respect to relator's case and thereby occasioned some delay, although the exact extent is not revealed.

■ The District Attorney, however, did state the "primary delay * * * approximately ten months * * * was a result of the unavailability of the trial transcript." This does not excuse the state's delay. It merely shifts the onus from the state judiciary to another arm of the state. And it is the entire state system that we look to in determining whether there has been inordinate delay. Cf. United States ex rel. Hill v. Deegan, 268 F.Supp. 580 (S.D.N.Y.1967).

We also note that the only action taken by the state courts so far has been the granting of leave to the relator to file post-trial motions *nunc pro tunc*. This clearly does not demonstrate to us that the state intends to expedite this case in the future. For, as was said by the District Attorney, "when a defendant is allowed to file post-trial motions *nunc pro tunc*, at the post-trial motions hearing he is [only] allowed to raise any issues which do not require actual testimony to be taken." This would be of no assistance on the involuntary confession issue; and at best could only result in an order setting up a hearing. We are convinced that relator's rights cannot be vindicated unless we consider the issue now.

## II. Involuntary Confession

On September 18, 1957, a 17-year-old white girl was beaten and raped by a group of Negro boys. That same evening the relator was picked up by the police for questioning but was later released after the prosecutrix, who knew relator, failed to identify him as one of her assailants. Relator claims that during this period the police not only physically abused him but also used language with clear racial overtones. During the entire time relator denied any involvement in the crime.

At 6:15 p. m. on September 20 relator, while in the vicinity of his home at 3415 Reed Street, Philadelphia, was again taken into custody and driven to the Morals Squad Headquarters at 21st and the Parkway. Upon his arrival there the desk sergeant, Sergeant Smith, had a general discussion with relator for ten to fifteen minutes and then assigned Officer Winchester to carry on the interrogation.

At this point, as is usual in cases of this nature, the facts, as developed at our hearing, are contradictory.

Relator's story is that Winchester took him into a small room and started questioning him about his involvement in the crime. After denying any involvement relator was struck by Winchester. Another police officer then relieved Winchester and continued the questioning. Again after denying involvement relator was subjected to physical abuse. This "punching" continued until relator signed a statement. Relator claims to have signed to avoid any further physical punishment.

Although the exact length of time of the period involved is unknown, relator said he was taken to another building about an hour or so after he signed the statement and that at this time there was daylight. If this story is true it follows that the interrogation went on most of the night.

The story of the police is markedly different. Winchester testified that after Sergeant Smith talked with relator for ten to fifteen minutes he was turned over to him for questioning. Then, after a short interview, he gave a statement and signed it.[2] No force was used to extract the statement.

2. The statement itself showed that it was signed at 7:20 a.m. on September 20. We know this not to be so since it is undisputed that relator was not taken into custody until the evening of September 20.

Relator's counsel argues that the date is wrong and really should be September

Certain facts, however, are undisputed. Relator at the time was 17 years old with a Junior High School education. The fact that relator appeared frightened is admitted by Winchester. And we also know that relator was not given any warnings as to his constitutional rights, and in fact was told that it would be to his benefit to cooperate and sign the statement.

One question that looms large concerns itself with the time span involved. Relator was picked up at 6:15 p. m. The police claim that he signed the statement at 7:20 p. m. Of course at our hearing the police, in candor, admitted that they were not testifying from an independent recollection. However, they did stand by the 7:20 p. m. time which was on the confession. We find it impossible to believe that the following could have taken place within sixty-five minutes:

1. Relator was arrested at 6:15 p. m. at 3415 Reed Street.

2. He was driven to the Moral Squad Headquarters—a distance of some 57 blocks.

3. The police vehicle was parked and he was taken inside.

4. He spoke with Sergeant Smith for ten to fifteen minutes.

5. He was turned over to Winchester who, at the very least, merely took down the statement.

6. Relator's statement was shown to Winchester's superiors.

7. Relator then signed the statement.

Sergeant Smith admitted on cross-examination that all of these events could not have occurred in between 6:15 p. m. and 7:20 p. m. In fact Smith stated that it would take at least an hour just to take down the statement.

Based on the above we reject the testimony of the police that the relator signed the statement at 7:20 p. m. and find as a fact that relator was with the police for a considerably longer period before signing.

One further question and perhaps the most important concerns itself with whether relator was physically abused. Although the testimony is in direct conflict, there are three significant factors which lead us to accept relator's testimony.

*First,* all the police officers testified that they had no independent recollection of the facts. Furthermore, of the three police officers to testify, two were not in a position to be certain as to whether physical force was used since they were not in the interrogating room.

*Second,* the testimony of the police officers, not only with respect to the time element already discussed but in general, is so shot through with contradictions that we consider it unworthy of belief.

*Third,* and perhaps most important, relator's story is in part corroborated by the testimony of a co-defendant at trial. The testimony there by Joseph Crosland was as follows:

"Q. Did you hear anything with regard to these other defendants?

"A. Yes. I heard one of the fellows in there hollering, 'Please don't hit me any more;' and I heard a lot of bumping on the wall.

"O. Could you identify the voice?

"A. If I am not mistaken, I might say it was Donald.

BY THE COURT:

"Q. Donald Johnson?

"A. That's right, because one of the detectives took me in the room, if I am not mistaken. I think he said,

---

21 thereby supporting his claim. The police, however, claim that it should be

7:20 p.m. on September 20 thereby supporting their position.

'This boy is trying to deny that he was there.'

"Q. What did you hear him say?

"A. Who?

"Donald.

"A. Well, I didn't hear him say nothing. When I come in the room, he was standing in the corner, shivering and crying."

Certainly it cannot be disputed that Crosland's testimony is far less self-serving than that of either relator or the police officers. And we can find no reason why Crosland would have so testified at trial unless he actually did see this.

Thus, we find as a fact that relator's confession was induced, at least in part if not entirely, by a desire to avoid further punishment.

This in itself is enough for us to hold that the confession was involuntary. See Brown v. State of Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L. Ed. 682 (1936). And we are buttressed by other circumstances. Davis v. State of North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) leaves no doubt that the absence of warning is a factor to be considered in determining voluntariness. Here, an untutored boy of seventeen, obviously frightened at his first experience with police custody not only was given no warning of his rights, but rather was a victim to the shabby deceit of an assurance that it would be to his benefit to confess.

Based on the above factors we have no hesitancy in holding that the confession was not the product of relator's free will and therefore its introduction into evidence at trial deprived him of due process of law.

We are deeply grateful to Lawrence T. Hoyle, Jr., Esquire, for his able and forceful representation of relator, thoughtfully performed and without compensation.