No. 22628.

DAVID C. NEZ *v.* THE PEOPLE OF THE STATE OF COLORADO.
(445 P.2d 68)

Decided September 16, 1968.

24

Gordon H. Rowe, Jr., for plaintiff in error.

Duke W. Dunbar, Attorney General, Frank E. Hickey, Deputy, James F. Pamp, Assistant, for defendant in error.

*En Banc.*

Mr. Justice Hodges delivered the opinion of the Court.

David C. Nez, who will hereafter be referred to as defendant, is here by writ of error seeking reversal of a judgment sentencing him to a term of from 15 to 20 years for second degree murder .

Defendant was charged with the first degree murder of his wife, Ida Louise Nez. After trial, the jury found him guilty of second degree murder, and judgment was entered accordingly.

Under the facts and circumstances of this case, the trial court erred in allowing into evidence oral inculpatory statements made by the defendant at the scene of the slaying, and a written incriminating statement signed by the defendant at the jail. Only those facts

relevant to these alleged errors will be set forth. We deem it unnecessary to consider the other assigned errors in view of our disposition which reverses the trial court's judgment and remands this cause for a new trial.

Defendant is a full-blooded Navajo Indian, and so was his wife. He did not complete the fourth grade in school and his ability to speak and understand the English language was such that an interpreter was used at defendant's preliminary hearing. There is evidence to show that defendant could neither read nor write "very well." He was indigent and was afforded a court appointed lawyer who represented him at arraignment and trial.

Defendant and his wife came to Colorado from the Navajo Indian Reservation to work in the fields during the potato harvest. They were living in a single room in the middle of a tenant house located on a ranch. On Saturday, October 2, 1965, defendant and his wife went into town, where they bought five quarts of wine, returned home, and started drinking about 9:00 P.M.

About noon on Sunday, October 3, 1965, Undersheriff Robran and Deputy Sheriff Valdez came to the tenant house in response to a telephone call for assistance which they had received from the ranch owner. After knocking repeatedly on the door of the Nez room and receiving no answer, the officers forcibly knocked the door open. When they entered the room, they found the defendant standing with a bottle of wine in his hands, and on the bed was the defendant's slain wife. Undersheriff Robran then told Deputy Sheriff Valdez to keep defendant under surveillance. Valdez told defendant to get into the sheriff's car, which was parked a few feet away from the tenant house. Defendant complied. Within a few minutes, Undersheriff Robran came to the car, and interrogated defendant. The officer was permitted to testify before the jury as to the contents of that interrogation, in the course of which, the defendant

admitted killing his wife with a knife. When asked where the knife was located, the defendant answered that it was "inside the house."

Thereupon, Undersheriff Robran and defendant re-entered the house, where defendant reached under the bedding, brought out a broken butcher knife, and handed it to the officer. Robran testified that he then asked defendant, "What time did you kill her?" and that defendant replied, "At midnight." At this juncture, Undersheriff Robran placed defendant under formal arrest and told Officer Valdez to take defendant to the Monte Vista City Jail.

Defense counsel objected to the foregoing testimony about the interrogation, prior to its being given. A hearing was then held out of the presence of the jury. Undersheriff Robran testified that he did not advise defendant, either before questioning him in the car or in the house, that he did not have to say anything, or that anything he said might be used against him, or that he had a right to an attorney at that time. Indeed, our careful examination of the record confirms the officer's testimony that no admonitions whatsoever were given to defendant before his interrogation at the scene of the slaying.

The officer's stated reason for failing to advise defendant of his rights was that defendant was not under arrest at the time. This, in our view, is specious. Defendant was the only person in a locked room with his slain wife when the officers entered and, Officer Robran himself declared in his foundation testimony that defendant "was the main suspect because he was in the room when I first entered it." Moreover, several hours after defendant's interrogation and arrest, the judge adjourned defendant's preliminary hearing, because he found defendant to be too intoxicated ". . . and not sufficiently in possession of his senses to continue with the hearing . . . ." We have also noted that before the hearing was thus adjourned, an interpreter had been secured

at the court's request, and further, that when the court asked defendant if he understood that he had a right to a lawyer, defendant replied "no."

All the facts and circumstances surrounding the incriminating oral statements made by the defendant at the scene of the crime strongly implant involuntariness upon them. The fact that the defendant was not under formal arrest at the time he made these statements is unimportant because: he was in police custody; he was the main suspect; he was in the locked room occupied by him and his wife before her demise; and from the moment he was discovered in the room which had to be forcibly entered by the officers, the accusing finger was surely directed at this defendant. The questions of the officer in this posture were obviously for the main purpose of eliciting incriminating statements from the defendant. All of these factors amount to an unusually strong premise upon which the trial court should have excluded these oral incriminating statements made by the defendant in answer to the questions by the Undersheriff.

The facts surrounding the written statement signed by defendant also formulate a clear basis for exclusion, and we add that these facts also eliminate any valid reason why the written statement should have been deemed to be admissible. After Sunday's preliminary hearing was adjourned because defendant was intoxicated, he was taken back to jail, and the Undersheriff immediately "conversed with him" for about a half-hour in a room where police officers were coming and going. On Monday morning, October 4, 1965, the preliminary hearing reconvened, during which defendant was advised of his rights, but no interpreter was then present. Thereafter, on the same morning, defendant was apparently questioned two more times at the jail. The first interrogation occurred about 9:30 A.M. at which defendant, the sheriff, and the undersheriff were present. The second interrogation occurred about 11:00 A.M., at

which defendant, the undersheriff, and Henry Trujillo, an investigator from the District Attorney's office, were present. At this time, Trujillo wrote out a statement in his own handwriting, in which it was stated that defendant had killed his wife, and defendant signed it.

Defense counsel moved to exclude this signed statement, and again a hearing was held out of the jury's presence. Mr. Trujillo's foundation testimony disclosed that before defendant's statement was taken, defendant was not told by Trujillo that he did not have to give a statement nor was he told that what he did say could be used against him. No attorney on behalf of the defendant was present nor was he then advised of his right to have an attorney present and, he was not told why the statement was being taken. No interpreter was present when the statement was written. Mr. Trujillo's explanation for the statement being in his own, rather than defendant's handwriting is that defendant said that he "could not read or write very good." Cross-examination revealed that to some of the questions asked, defendant had answered with only a "yes," and that Mr. Trujillo had then written down in the statement his own questions, restated affirmatively, as the defendant's answers. Also, the written statement does not contain the customary language that the accused has been advised of his rights or that he made the statement voluntarily.

The main issue is whether defendant's oral statements to the officer at the scene of the slaying and the written statement signed in jail by the defendant were voluntarily given. We hold they were involuntarily given, and that due process requires their exclusion. *Jordon v. People*, 161 Colo. 54, 419 P.2d 656.

Each case which involves the question of whether self-incriminating statements by the defendant in a criminal proceeding were made voluntarily or involuntarily must be decided on its own facts. We base our decision of the involuntariness of both of defendant's statements

on the "totality of circumstances" of this case. *Jordan, supra, Greenwald v. Wisconsin,* 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77.

 The record reveals that defendant was not advised of any of his constitutional rights by the interrogating officer before either the oral or written statements were made by him. If this case had been tried after *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, rejection of both the oral and written statements of the defendant would have been automatic. Although the *Miranda* decision is not retrospective in application, failure to advise a defendant of his right to remain silent or of his right respecting counsel at the outset of interrogation, as *Miranda* requires, have long been significant tests in determining the voluntariness of self-incriminating statements. *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895.

 However, this case was tried after the decision in *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977. We hold that defendant's statements used against him at the trial were also inadmissible under the rule of *Escobedo* as confirmed in *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882. The precise holding of *Escobedo* is that statements elicited by law enforcement officials during an interrogation may not be used against the accused at a criminal trial, "(where) . . . the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent . . . ."

See also *Maes v. People,* 160 Colo. 528, 418 P.2d 891, wherein we stated that "The concept of police interrogation which falls within the ambit of the *Escobedo*

opinion is a process of interrogation that lends itself to eliciting incriminating statements."

The "totality of circumstances" here fall within the five specifics of the *Escobedo* rule, except in one respect: defendant never requested a lawyer, nor was he denied an opportunity to consult with a lawyer. But this defendant was a semi-literate Navajo Indian, with limited understanding of the English language, and ignorant of legal processes and constitutional rights. It would violate the intendment of the *Escobedo* rule to deny its application to a defendant because he failed to request counsel, when his failure is derived from that very ignorance which demands solicitude from our legal processes.

The oral and written inculpatory statements of the defendant were involuntary and therefore, inadmissible. The totality of the facts and circumstances surrounding the interrogations which elicited these statements, and their admission into evidence are violative of fundamental concepts which guarantee a fair trial to an accused.

The judgment is reversed and the cause remanded for a new trial.

Mr. Justice McWilliams and Mr. Justice Groves not participating.