**William Donovan JACKSON, Appellant,**

v.

**J. D. COX, Superintendent of the Virginia State Penitentiary, Appellee.**

**No. 14073.**

United States Court of Appeals,
Fourth Circuit.

Argued Nov. 11, 1970.

Decided Dec. 30, 1970.

S. Strother Smith, III, Abingdon, Va. (Court-assigned counsel), for appellant.

James E. Kulp, Asst. Atty. Gen. of Virginia (Andrew P. Miller, Atty. Gen. of Virginia, on the brief), for appellee.

Before CRAVEN and BUTZNER, Circuit Judges, and THOMSEN, District Judge.

BUTZNER, Circuit Judge:

William Donovan Jackson was convicted on pleas of guilty to two indictments charging first degree murder and sentenced to two concurrent terms of fifty years each in the Virginia penitentiary. Contending that his guilty pleas were the result of a coerced confession and incompetent advice of counsel, Jackson appeals the denial of his petition for a writ of habeas corpus. The district judge, after an evidentiary hearing, held that Jackson's confession was not coerced, that his guilty plea was voluntary and intelligent, and that he was represented by competent counsel. Jackson v. Peyton, 303 F.Supp. 1104 (W.D.Va.1969). We affirm.

In September 1964, Jackson was arrested for the murder of two women in Buchanan County, Virginia. He was granted a preliminary hearing in October at which he was represented by appointed counsel, George C. Sutherland. Early in January 1965, he was indicted and Sutherland was reappointed to represent him. Several weeks later Jackson pleaded guilty, and after examination on arraignment[1] and consideration of evi-

---

1. The trial judge questioned Jackson as follows:

Q—Have you had an opportunity to consult with your attorney in these cases?
A—Yes, sir.
Q—Have you consulted with him more than once, that is, on several occasions?
A—Yes, sir, I have.
Q—Has that been privately, you have had that opportunity to consult with your attorney privately?
A—Yes, sir.

Q—Have you been advised and do you understand that you have a right to a trial by a jury?
A—Yes, sir.
Q—Have you been advised and do you understand that when you enter a plea of guilty, that a jury does not fix the punishment on a plea of guilty?
A—Yes, sir.
Q—That the punishment is fixed by the Court?
A—Yes, sir.
Q—You understand that?

dence about the crime, the trial judge accepted his plea.

A co-defendant, Jerry Fuller, whose trial had been separately scheduled, also pleaded guilty to being an accessory before the fact to each crime. He, too, was sentenced to two concurrent fifty-year terms of imprisonment. It was the state's theory that Fuller, whose wife was an heir of one of the victims, procured Jackson to commit the murders.

■ In McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L. Ed.2d 763 (1970), the Court held "that a defendant who alleges that he pleaded guilty because of a prior coerced confession is not, without more, entitled to a hearing on his petition for habeas corpus." But when this allegation is linked, as it is here, to a charge that the prisoner was represented by incompetent counsel, the habeas court must determine whether the guilty plea was intelligent. This in turn primarily depends "not on whether a court would retrospectively consider counsel's advice [about the admission of the confession] to be right or wrong, but on whether that advice was within the range of competence demanded of attorneys in criminal cases." 397 U.S. at 771, 90 S.Ct. at 1449. The district court, hearing the case before *McMann*, ruled on both the voluntariness of the confession and the competence of counsel. In view of *McMann*, we find it necessary to consider only Jackson's assignments of error concerning Sutherland's representation.

■ Jackson asserts his counsel was incompetent because he did not advise him between the time of the preliminary hearing and the return of the indictment, he failed to investigate the case properly, and he did not move to exclude the confession. Jackson says his confession could have been excluded because he was beaten, kicked, plied with whiskey and beer, and subjected to solitary confinement. Jackson also asserts that his lawyer should have sought a change of venue. He did not pursue this point in the district court, and we find no merit in it on the scant references to the question of venue found in this record.

A—Yes.

Q—Have you also been advised by your attorney that you can not be compelled to give evidence or testimony against yourself?

A—Yes, sir.

Q—You understand that?

A—Yes, sir.

Q—Have you also been advised that you have a right, if you want to, to testify?

A—Yes, sir.

Q—That is your privilege but it has to be voluntary on your part.

A—Yes, sir.

Q—You understand that?

A—Yes, Sir.

Q—When you entered your plea of guilty to murder in the first degree, in each of these cases, do you understand that to mean pleas of guilty—that when you entered your pleas of guilty in each of these cases, did you understand by that plea that you were pleading guilty to murder in the first degree?

A—Yes, sir.

Q—That is your plea at this time in each one of these cases now?

A—Yes, sir.

Q—Has your attorney advised you of the punishment for murder of the first degree?

A—Yes.

Q—That it is punishable by confinement in the penitentiary for a term not less than twenty years?

A—Yes, sir.

Q—Or it may be for life imprisonment in the penitentiary or a term not less than 20 years, or death, you understand that?

A—Yes, sir.

Q—You understood that in each one of these cases?

A—Yes, sir.

Q—There are two of these cases?

A—Yes, sir.

Q—All right, have you had all the opportunity that you wanted to consult with your attorney?

A—Yes, I have.

Q—Anything further, anything that you know of that your attorney could do for you that he hasn't done?

A—No.

Q—What is your answer?

A—No.

Q—You mean by that he has done all that could be done for you?

A—Yes.

In 1964, just several months before Jackson was arrested, Virginia amended its laws concerning the representation of indigents charged with felonies by providing counsel at the preliminary hearing who "shall represent the defendant * * * at all stages of the proceeding until relieved * * *."[2] Sutherland interpreted this statute to mean that during the time between the preliminary hearing and the next stage of the proceeding, the return of the indictment, he did not represent Jackson. Consequently, when Fuller's retained counsel approached Sutherland shortly after the preliminary hearing with the suggestion that both defendants would be better off if they did not talk to the police, Sutherland took the position that he was not acting as Jackson's counsel. He also responded to an inquiry from the police by saying that if they wished to talk to Jackson, as far as he was concerned, they could do so.

While we do not interpret the Virginia statute as narrowly as Sutherland did, we conclude that under the facts of this case, Jackson was not deprived of effective representation of counsel because Sutherland did not recognize a continuing obligation of representation between stages of the proceedings. Sutherland knew that he would likely be reappointed to represent Jackson by the state trial court. Therefore, he prepared himself for trial by receiving from time to time reports from the investigating officers on all of the facts that their investigation disclosed. In the meantime, the police and prosecutors frequently questioned Jackson. The officers informed Jackson of his right to remain silent and his right to counsel. On the only occasion that

Jackson sought advice, Sutherland responded by going to the sheriff's office and answering Jackson's inquiry. No complaint is made about the quality of the advice he gave on this occasion. After making two partial statements, Jackson confessed on November 13, 1964, fully implicating both himself and Fuller.

On January 11, 1965, the trial judge reappointed Sutherland to represent Jackson. The trial was set for February 1. During the nearly three weeks that intervened, Sutherland conferred with Jackson on several occasions in preparation for the trial. From his investigation, he knew the state was prepared to prove that the victims had died from stab wounds; that Fuller recently had persuaded another man to purchase a knife; and that he had unsuccessfully sought to engage this man to kill Mrs. Fuller's kin. Sutherland knew this man had refused to commit the crimes; that he had been located; and that he probably would testify. Sutherland had also learned that the state could prove that Jackson, who was absent without leave from the army, had visited Fuller's home on the night of the murders and discarded his army uniform and dog tag in Fuller's outdoor privy. The state could also show, Sutherland knew, that immediately after the crime Jackson went to West Virginia where he disposed of watches belonging to the victims. Finally, of course, Sutherland was familiar with Jackson's confession.

Jackson's claim that state officers forced him to confess was first raised in post-conviction proceedings where both state and federal judges found it to be untrue.[3] Jackson did not tell Sutherland

2. Va.Acts of Assembly, ch. 657 (1964), as amended. Va.Code Ann. §§ 19.1–24.1 through 241.6 (Supp. 1970).

3. Sometime after Jackson began serving his sentence, Herman M. Fix, Jr., claimed that he and not Jackson committed the murders. Fix also exonerated Fuller. He was a fellow inmate of Jackson and Fuller at the Virginia Penitentiary, and he is now confined to the Maryland Penitentiary for murder. Fix's

confession has not been tendered to any Virginia court. His confession and deposition were offered to the federal district court for the limited purpose of corroborating Jackson's claim that his confession was coerced. The district court, after a careful study of Fix's deposition, found that "his story is unreasonable and unbelievable." His refusal to credit Fix is not clearly erroneous.

about the police conduct of which he now complains, nor did he tell Sutherland his confession was coerced in any way.

■ Jackson claims he was held in solitary confinement from the time of his arrest in September until he confessed on November 13. Sutherland testified that Jackson complained to him about his isolation, but Sutherland was left with the impression that Jackson had been held in solitary confinement "some two or three days or longer." In this, Sutherland is partially corroborated by the sheriff, who disputed Jackson's version of the length of his solitary confinement.

Sutherland's knowledge of Jackson's confinement does not brand him incompetent for failure to contest the confession. In the first place, Jackson, while complaining of the isolation, did not contend until after his conviction, when he applied for a writ of habeas corpus, that it coerced his confession. Secondly, Jackson's wife and mother were allowed to visit him, and within two weeks of his arrest Fuller's lawyer was granted permission to see him at any time. This lawyer interviewed him before he confessed. Moreover, Jackson was told he could have a lawyer present when he was questioned, and the only time he made this request it was granted. These facts could lead a lawyer of reasonable competence to distinguish this case from a situation such as occurred in Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966), where the prisoner's will was overborne by incommunicado detention.

■ Jackson also complains that his lawyer failed to locate and subpoena as a witness a truck driver, whose name Jackson did not know. Jackson relies on Coles v. Peyton, 389 F.2d 224 (4th Cir.),

cert. denied, 393 U.S. 849, 89 S.Ct. 80, 21 L.Ed.2d 120 (1968), in which we held that a prisoner was entitled to relief when the court-appointed public defender, burdened with a heavy schedule, failed to perform even a perfunctory investigation into facts which might support a defense. *Coles,* however, is readily distinguishable. No evidence was introduced that the unknown truck driver, even if he could be found, might provide a defense. Moreover, Jackson's attorney performed far more than a perfunctory investigation. He acquainted himself with the facts upon which the state intended to rely, he conferred with Jackson to learn his version of the facts, and there has been no showing that his understanding of the case was incomplete or mistaken.[4]

■ Sutherland advised Jackson to plead guilty. He gave this advice after conferring with Jackson about the facts that he had learned and after warning that a jury trial might result in a verdict of death. His advice to plead guilty, he says, was made after evaluating the entire case and not merely because of the confession. There can be no doubt that Sutherland's assessment of the admissibility of the confession was "within the range of competence demanded of attorneys in criminal cases", McMann v. Richardson, 397 U.S. 759, 771, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). Sutherland learned nothing of significance from Jackson that cast doubt on the confession's admissibility, and it was corroborated in part by evidence the state could show from independent sources.

■ Apart from his confession, Jackson maintains that his guilty plea was coerced because the prosecutor threatened to have him sentenced to death if he did not plead guilty and testify against Fuller. A guilty plea entered to

---

4. Jackson's claim about the truck driver appears to be an afterthought. At the evidentiary hearing on his state habeas corpus petition, Jackson testified:

Q. And you didn't know of any witnesses he might call on your behalf?
A. No.

Q. Did you offer any information to him that would have helped you in your defense?
A. He didn't ask me, I didn't know what would be, I never did discuss it with him in any way.

escape the death penalty is not in itself involuntary. North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970); Brady v. United States, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). But there is a caveat in *Brady,* differentiating "the situation where the prosecutor or judge, or both, deliberately employ their charging and sentencing powers to induce a particular defendant to tender a plea of guilty." 397 U.S. at 751 n. 8, 90 S.Ct. at 1470. Jackson's claim raises the issue of whether the prosecutor's tactics violated the *Brady* warning.

The prosecutor testified that after Jackson confessed, he asked Jackson to testify against Fuller. First Jackson agreed, but later he refused. The prosecutor then told Jackson that the crime was punishable by death and that if he pleaded guilty and testified against Fuller the court might accept the prosecutor's recommendation for a lesser sentence.

The prosecutor approached the limits of the permissible use of his powers, but for several reasons he did not exceed them. First, he did not use his charging powers by threatening additional prosecution. Second, the prosecutor told Jackson the same thing that he learned from his own attorney, namely, that if he went to trial he ran the risk of receiving the death penalty, but if he pleaded guilty he probably would get less. The inevitable discussion of potential punishment in plea bargaining is not so coercive that it renders a subsequent plea involuntary. North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). Moreover, Fuller also pleaded guilty, and Jackson was aware at his own arraignment both of Fuller's decision and the prosecutor's recommendation of punishment. Fuller's plea, therefore, removed the pressure and inducement for Jackson to testify.

We conclude that the district court properly held that Jackson was competently represented by counsel, and that his plea of guilty was voluntarily and intelligently made.

Affirmed.