# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00246-CR

**Salvador Santos Hernandez, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF WILLIAMSON COUNTY, 277TH JUDICIAL DISTRICT
NO. 07-507-K277, HONORABLE KEN ANDERSON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Salvador Santos Hernandez was charged by indictment with two counts of aggravated sexual assault of a child. *See* Tex. Penal Code Ann. § 22.021 (West Supp. 2008). Following a pretrial hearing in which the district court denied two motions to suppress evidence, Hernandez pleaded guilty to both counts. Punishment was tried to a jury. The jury assessed punishment at 75 years' imprisonment for count one and life imprisonment for count two. The district court ordered the sentences to run consecutively. Hernandez brings five points of error on appeal. In his first two points of error, Hernandez contends that the district court abused its discretion in denying each of his motions to suppress. In his other three points of error, Hernandez asserts that the length of his sentences and their cumulation constitute cruel and unusual punishment. We will affirm the judgment.

# BACKGROUND

The underlying facts of this case are not disputed on appeal. Hernandez was accused of sexually assaulting, on two separate occasions, E.L., the twelve-year-old daughter of Hernandez's common-law wife, Nicolasa Fajardo. At trial, E.L. testified about both incidents, one of which resulted in E.L. becoming pregnant. The pregnancy was discovered by Fajardo. Fajardo testified that, when she confronted her daughter about the pregnancy, E.L. told her that Hernandez had had sexual intercourse with her. Fajardo then called the police. By this time, according to Fajardo, Hernandez had returned to Mexico.[1]

The following testimony was elicited during the hearing on the motions to suppress. Detective Craig Murray of the Georgetown Police Department, the lead investigator in the case, described the investigation after Fajardo reported the abuse. Detective Murray first set up an interview with E.L. at the Williamson County Children's Advocacy Center. Forensic interviewer Elda Jasso conducted the interview and briefed Murray on what E.L. had told her. Following the interview, Murray arranged for E.L. to be examined at Johns Community Hospital for evidence of sexual assault. Afterward, Murray spoke with the registered nurse who performed the examination and confirmed that E.L. was pregnant.

The next step in the investigation, Detective Murray explained, was to obtain a DNA sample from fetal tissue. Murray had been advised by Fajardo that E.L. was going to have an abortion at a Planned Parenthood facility in Austin. After the procedure was performed, Murray went to the facility and retrieved a sample of the fetal tissue. Murray then transported the sample

---

[1] Apparently, Hernandez was seeking a job in local law enforcement.

to the University of North Texas Health Science Center in Fort Worth for analysis. Before going to Fort Worth, Murray testified, he obtained an arrest warrant for Hernandez. The warrant was issued on February 22, 2007.

On the morning of April 11, Fajardo informed the police department that Hernandez had returned from Mexico. The person with whom Fajardo spoke was Rita Reyes, a record specialist at the department who spoke Spanish. Reyes had previously assisted Detective Murray in communicating with Fajardo and E.L., who both spoke Spanish. Fajardo informed Reyes that Hernandez had "stepped out of the house to go do his registration papers for his vehicle."

Later that morning, Hernandez happened to stop at the police department to ask directions to the vehicle registration office. He entered the lobby of the police department and approached Reyes, who was seated at her desk behind the lobby counter. Reyes described her encounter with Hernandez:

> Well, he came in asking for directions. He was holding his papers for the registration, where to find the office. And usually when people come in, they'll ask for different areas of where to go, so I look at their papers to see where they're going to go, you know, make sure that I'm going to give them the right direction. And then when I saw, you know, his name on the paper, I asked him, 'What is your name?', and he said his name, and then it clicked. And I was like, you know, since I heard that morning that he had stepped out to go do his paperwork, and then there was the name on the paperwork, and he said that was his name, I said please hold, you know, wait a moment, and that's when I let Detective Murray know that Mr. Hernandez was in the lobby.

Detective Murray testified that, when Reyes advised him that Hernandez was in the lobby, he "met Mr. Hernandez in the lobby," identified him "through his Texas ID card," "brought him into the door out of the public, and we took him into custody."

3

After arresting Hernandez, Detective Murray and Sergeant Rene Alvarez led Hernandez into an interview room where they proceeded to interrogate him. Sergeant Alvarez served as the translator between Murray and Hernandez. According to Murray, the interrogation, which was videotaped, lasted approximately 40 minutes. At the beginning of the interrogation, Hernandez, after being informed that he was under arrest for the offense of sexual assault of a child, was read his *Miranda* warnings.[2] During the interrogation, the officers asked Hernandez to sign a "Consent to Seize" form in order to obtain a saliva sample for purposes of DNA testing. Alvarez read to Hernandez the contents of the form in Spanish. Hernandez subsequently signed the form, and the officers obtained a sample of Hernandez's saliva.[3] Shortly thereafter, Hernandez admitted to having "sexual relations" with E.L., but he claimed that it happened only "one time." At the conclusion of the interrogation, Murray testified, "the handcuffs were placed back on [Hernandez], and he was transported to the jail."

Hernandez was charged by indictment with two counts of aggravated sexual assault of a child. The first count alleged that Hernandez sexually assaulted E.L. on or about October 10, 2006. The second count alleged that Hernandez sexually assaulted E.L. on or about November 20, 2006.

Prior to trial, Hernandez filed two motions to suppress evidence. In the first motion, Hernandez claimed that his apprehension at the police department was without probable cause. In

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[3] At trial, the jury heard evidence that DNA testing of the fetal and saliva samples revealed that Hernandez could not be excluded as the father of E.L.'s fetus. In fact, the "probability of paternity" was "99.9998 percent as compared to an untested randomly chosen male from the Southwestern Hispanic population." In contrast, "99.9991 percent" of males in the general population could be excluded as the father.

4

the second motion, Hernandez sought specifically to suppress the evidence resulting from the seizure of his saliva sample. He asserted that the seizure "was without the consent and understanding of Defendant" and that, "in the absence of a search warrant or an exception to the search warrant requirement, any evidence seized is inadmissible." Following a hearing, the district court denied both motions.

Subsequently, Hernandez pleaded guilty to both counts of the indictment. After hearing evidence, a jury assessed a sentence of 75 years' imprisonment for count one and life imprisonment for count two. The State filed a motion to cumulate the sentences, which the district court granted. This appeal followed.

## ANALYSIS

**Suppression issues**

In his first point of error, Hernandez contends that the district court abused its discretion in denying his motion to suppress the saliva sample obtained from Hernandez without a warrant. In his second point of error, Hernandez asserts that the district court abused its discretion in denying his motion to suppress "evidence obtained from the illegal stop and arrest by officers of the Georgetown Police Department."[4]

---

[4] In response to both points of error, the State claims that Hernandez "waived the arguments presented" in his motions to suppress when he voluntarily pleaded guilty. *See Lewis v. State*, 911 S.W.2d 1, 4-5 (Tex. Crim. App. 1995) ("A nonnegotiated guilty plea is conclusive as to the defendant's guilt and waives all nonjurisdictional defects occurring prior to the guilty plea.") (citing *Helms v. State*, 484 S.W.2d 925, 927 (Tex. Crim. App. 1972)). However, after *Lewis* was decided, the court of criminal appeals held that "a valid plea of guilty or nolo contendere 'waives' or forfeits the right to appeal a claim of error only when the judgment of guilt was rendered independent of, and is not supported by, the error." *Young v. State*, 8 S.W.3d 656, 667 (Tex. Crim. App. 2000). In this case, the record reveals that Hernandez changed his plea from not guilty to guilty only after the

We review a ruling on a motion to suppress evidence for abuse of discretion. *Shepherd v. State*, ___ S.W.3d ___, 2008 Tex. Crim. App. LEXIS 855, at *6 (Tex. Crim. App. Sept. 10, 2008) (citing *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). In so doing, we view the facts in the light most favorable to the trial court's decision. *Id*. When the trial court fails to make explicit findings of fact, we imply fact findings that support the trial court's ruling so long as the evidence supports the findings. *State v. Kelly*, 204 S.W.3d 808, 818-19 (Tex. Crim. App. 2006). We give almost total deference to a trial court's express or implied determination of historical facts and review de novo the court's application of the law of search and seizure to those facts. *Id*. (citing *State v. Ross*, 32 S.W.3d 853, 856 (Tex. Crim. App. 2000)).

We first address the district court's ruling on Hernandez's motion to suppress evidence obtained through the seizure of his saliva sample. Hernandez claims that he signed the consent form "without actual knowledge and understanding of the import of his actions." Hernandez asserts that there were "significant translation errors" during the interrogation that "made it impossible for him to fully comprehend . . . that he was signing a consent form allowing the

---

district court denied his motions to suppress evidence. The evidence Hernandez sought to suppress included his confession to the police officers that he had "sexual relations" with E.L., and his DNA evidence tending to prove that he had impregnated E.L. On this record, we find that the judgment of guilt is not independent of the trial court's ruling on the motions to suppress the evidence of the offense, and the judgment is supported by the evidence Hernandez sought to suppress. *See id*.; *see also McKenna v. State*, 780 S.W.2d 797, 799 (Tex. Crim. App. 1989) ("[I]f the evidence appellant maintains should have been suppressed is instrumental in obtaining a conviction[,] then the appellate court should review the merits of the motion on appeal."). Accordingly, we conclude that Hernandez did not waive the arguments presented in his motions to suppress by pleading guilty.

officers to seize his saliva." Additionally, Hernandez asserts that he signed the form "involuntarily and under coercion." He contends that Detective Murray, throughout the interrogation, "intimidated" him.[5]

In determining the reasonableness of a search or seizure, the actions of police are judged by balancing the individual's privacy interest against the State's interest in law enforcement. *Gutierrez v. State*, 221 S.W.3d 680, 685 (Tex. Crim. App. 2007). There is a "strong preference" for searches and seizures to be administered pursuant to a warrant. *Id*. (citing *United States v. Ventresca*, 380 U.S. 102, 106 (1965)). However, "if police have probable cause coupled with an exigent circumstance, or they have obtained voluntary consent, or they conduct a search incident to a lawful arrest, the Fourth Amendment will tolerate a warrantless search." *Id*. (citing *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App. 2003)).

In this case, the issue is whether Hernandez's consent to seize his saliva was valid. Consent is valid when it is voluntarily given. *Harrison v. State*, 205 S.W.3d 549, 552 (Tex. Crim. App. 2006). The validity of a consensual search is a question of fact, and the State bears the burden to prove by clear and convincing evidence that consent was obtained voluntarily. *Gutierrez*, 221 S.W.3d at 686. This burden includes proving that consent was not the result of duress or coercion. *Id*. To determine whether this burden is met, we examine the totality of the circumstances. *Harrison*, 205 S.W.3d at 552.

---

[5] Hernandez also asserts in his first point of error that the officers lacked probable cause to seize his saliva. Probable cause would be required only if Hernandez's consent to seize was invalid. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Carmouche v. State*, 10 S.W.3d 323, 331 (Tex. Crim. App. 2000). Because we ultimately hold that the record supports a finding by the district court that Hernandez's consent was valid, we need not address this contention.

7

At the hearing on the motion to suppress, the State elicited the following testimony from Detective Murray:

Q.     And was the defendant ever threatened in any way?

A.     No, ma'am.

Q.     Ever promised anything?

A.     No, ma'am.

Q.     Ever coerced into talking to you or anything untoward said to him?

A.     No, ma'am.

Q.     Did he appear to understand what was going on?

A.     He did.

Q.     And did he appear to be in any kind of discomfort?

A.     Not at all.

Q.     Never asked to use the bathroom?

A.     No, ma'am.

Q.     Never asked for something to drink or something to eat?

A.     No, ma'am.

Q.     Nobody ever took out their weapons or anything like that?

A.     No, ma'am.

Q.     And was he read his *Miranda* warnings by Sergeant Alvarez?

A.     Yes, ma'am.

Q. Now, during this interview, did you tell him what the allegations were against him?

A. Yes.

Q. And then did you ask for a saliva sample for his DNA?

A. Yes, ma'am, I did.

Q. Did you actually have Sergeant Alvarez go over the form with him, the consent to search form?

A. Yes, ma'am.

Q. And then did the defendant appear to understand what was going on?

A. Yes, ma'am.

Q. And did he appear to understand that when he signed the form?

A. Yes, ma'am.

The State elicited similar testimony from Sergeant Alvarez. Also, the State asked Alvarez additional questions about his communication with Hernandez:

Q. Did he appear to be able to understand your communication with him?

A. Yes, ma'am. I do believe so.

Q. Did he ever indicate to you that he wasn't understanding your communication? I guess—I guess what I'm saying, there are different dialects of Spanish, maybe different regional words that people use, right?

A. There are some different words.

Q. But did he appear to be able to understand your Spanish?

A. Yes. He appeared to understand it. I had no reason to believe he did not understand it.

9

Q.    And did you understand his?

A.    Yes.  I understood his.

Alvarez further described how he read Hernandez the *Miranda* warnings twice.  The first time he read them, Alvarez testified, Hernandez told him that "he did not understand."  Alvarez explained, "I started to read them again, and I read them one at a time, asked him if he understood each one separately."  This time, according to Alvarez, "He stated that he did understand."

Next, Sergeant Alvarez testified about the "Consent to Seize" form:

Q.    And then pretty early on in the discussion, did there—was there a discussion about getting a DNA sample from the defendant?

A.    Yes, there was.

. . . .

Q.    And then did you at some point read to him—interpret into Spanish a consent to seize a saliva sample form to the defendant?

A.    Yes, I did.

Q.    And did he appear to understand what you were telling him?

A.    Yes, ma'am.

Q.    Did he ever at any point ask you any questions about his ability or—to give consent to search—

A.    No.

Q.    —take the saliva sample?

A.    No.  He did not ask questions.

Q.    Did he appear to be cooperative with your request?

10

A.     Yes.

Q.     And did he in fact sign the consent to seize a saliva sample paperwork?

A.     Yes, he did.

Q.     I'm going to show you what's marked State's Exhibit 5. Does that appear to be the original consent to seize the saliva sample form that you went over with the defendant?

A.     Yes, it does.

Q.     And it's in English, correct?

A.     Yes, in English.

Q.     But that's what you were translating to him in Spanish?

A.     Yes.

Q.     And did he sign that form?

A.     Yes, he did.

Q.     And he signed that in your presence?

A.     Yes.

Q.     And then you signed after he signed?

A.     Yes.

Q.     And did you tell the defendant that—you know, have him sign off on the fact that there weren't any promises or threats or force used on him to have him sign this?

A.     Yes, I did.

Q.     Did the defendant appear to willingly and voluntarily sign this form?

A.     Yes, he did.

On cross-examination, Sergeant Alvarez admitted that there were specific words on the consent form that he "might not have translated exactly." For example, instead of using the Spanish word for "seize," Alvarez used the Spanish word for "grab." Instead of using the Spanish word for "consent," Alvarez used the Spanish word for "asking." Also on the form, Alvarez did not translate the word "evidence." Instead, he used the Spanish term for "grab DNA." Additionally, repeatedly during the interrogation, instead of using the Spanish word for "sample," Alvarez used the Spanish word for "example." Further, Alvarez translated "agree" as "want," but explained that the phrase "if you want to give a sample" in Spanish means the same as "if you agree to give a sample." Alvarez admitted that a certified translator "absolutely" could have done "a better job" translating than he did, but maintained that Hernandez appeared to understand what the officers were asking of him:

> Q. Did you ever at any point in time get the feeling that the defendant didn't understand the gist of the request that you were asking of him?
>
> A. No.
>
> Q. And looking at the totality of the conversation from start to finish, when you and Detective Murray started asking him would he be willing to give a sample of his DNA with saliva, did he appear to cooperate with you?
>
> A. Yes.
>
> Q. And did he appear to understand what you were asking of him?
>
> A. Yes.
>
> Q. And maybe you didn't actually use the word "consent," but the point of the conversation was you were asking if he would give consent?
>
> A. The point of the conversation, yes.

12

. . . .

Q.      And the defendant signed the form willingly?

A.      Yes, he did.

Q.      And his actions seemed to indicate that he understood and was cooperating with your request and willing to give you a sample?

A.      Yes.  He was cooperating.

Q.      And during the taking of the sample, did he cooperate?  I mean, he opened his mouth willingly—

A.      Yes, he did.

Q.      —let Detective Murray take a sample?

A.      Uh-huh.  Yes.

Q.      Never protested in any way?

A.      No.

Q.      Never indicated wait a minute, I want to stop this?

A.      No.  No.

Q.      If he had ever at any point indicated that he didn't want to give a sample, you wouldn't have had him sign this form, would you?

A.      Not at all.

Q.      And that never happened?

A.      That did not happen.

In addition to observing the testimony of Detective Murray and Sergeant Alvarez, the district court considered a video recording and a transcript of the interrogation.  On the left

13

side of the transcription are the words, in Spanish or English, actually spoken by Alvarez, Hernandez, and Murray during the interrogation. On the right side of the transcript is a version of the interrogation with the corresponding words spoken in Spanish by Alvarez or Hernandez translated to English. The English version of the interrogation reflected the following exchange:

Murray:     Ask him if he knows what DNA is and all that stuff.

Alvarez:    Do you know what DNA is?

Hernandez:  No.

Alvarez:    From the blood, DNA.

Hernandez:  Oh, yeah.

Alvarez:    OK.

Murray:     OK.

Hernandez:  Uh-huh.

Murray:     Well . . . We already . . .

Alvarez:    Or the body.

Murray:     . . . have DNA . . .

Hernandez:  Uh-huh.

Murray:     . . . we have DNA from [E.L.] . . .

Alvarez:    We have [E.L.]'s DNA.

Hernandez:  Uh-huh.

Murray:     . . . we have DNA from a sample of the fetus.

14

Alvarez:     We have dee-en . . . DNA of . . . of an example boy, that is being born inside of her.

Hernandez:   Uh-huh.

Murray:      And I would like a sample of your DNA, to see if your DNA will match that of the fetus.

Alvarez:     We want a, a . . . an example of your DNA . . . to see . . .

Hernandez:   Uh-huh.

Alvarez:     . . . if it is the same as the child's.

Hernandez:   Uh-huh.

Murray:      Would you be willing to provide that sample?

Alvarez:     Do you want to give an example of that?

Murray:      Right now.

Alvarez:     Right now?

Hernandez:   If you want, yes.

Alvarez:     Yes, or . . . yes or no?

Hernandez:   Yes.

Alvarez:     He said "Yeah."

. . . .

Alvarez:     OK, he's going to grab the . . . is, uh . . . [UNINTELLIGIBLE] inside the mouth?

Murray:      Yes, the swab.

Alvarez:     We're . . . it's, like . . . Q-tip?

Hernandez:   Uh-huh.

15

Alvarez:       [UNINTELLIGIBLE] cheek from inside, we just clean on you a little.

Hernandez:    Uh-huh.

Alvarez:       That's all we need. We're going to grab one from the right, one from the left. One from the right, one from the left. OK? It's just an example of your saliva.

Hernandez:    Uh-huh.

Alvarez:       And from there they get the DNA.

Hernandez:    Uh-huh.

. . . .

Murray:       OK. Explain to him this is a consent to seize . . . evidence . . . and we're going to be asking for . . . saliva.

Alvarez:       This is only . . . that we're asking you . . . to grab the DNA, for saliva.

. . . .

Murray:       OK, have a seat. OK. What I need you to do, is . . . print your name right here . . .

Hernandez:    Uh-huh.

Alvarez:       Put your name there where he is, is pointing.

Murray:       OK, and basically just, just read to him all, everything that it states.

Alvarez:       OK. I'm going to read to you what the sheet says.

Hernandez:    Uh-huh.

Alvarez:       You . . . I, Salvador Hernandez . . . give . . . a right of . . . to Detective Murray . . .

Hernandez:    Uh-huh.

16

| Alvarez: | . . . an officer . . . and his agent . . . to . . . grab sample of your . . . person, of saliva. |
|---|---|
| Hernandez: | Uh-huh. |
| Alvarez: | . . . I understand I have the right to not give that sample . . . that . . . they have explained to me up here . . . also I notify that there are no promises . . . threats, forced . . . physical or mentally . . . against me, to give this, this sample of saliva . . . that . . . they have asked me for up here . . . nor to sign this form. The day four, eleven, two-thousand seven, time, nine forty-five in the morning. |
| Hernandez: | Uh-huh. |
| Alvarez: | OK? |
| Murray: | And if you, if you agree to give your sample of your saliva, sign right there. |
| Alvarez: | If, if . . . you want to give a sample of your saliva, sign there. |

Hernandez then proceeded to sign the form and allowed the officers to take a sample of his saliva from inside his mouth. The "Consent to Seize" form was also admitted into evidence, and it shows Hernandez's signature.

Construed in the light most favorable to the district court's ruling, we conclude that the totality of the above circumstances supports, by clear and convincing evidence, the district court's implied finding that Hernandez voluntarily consented to the seizure of his DNA. Throughout the interrogation, Hernandez indicated that he understood what the officers were asking him to do, and he agreed to do it. Although Hernandez initially indicated that he did not know what DNA was, he indicated his understanding after Alvarez explained it to him. When the officers informed Hernandez that they had DNA from E.L.'s fetus and that they wanted to compare his DNA

against the fetal DNA, Hernandez indicated that he understood. When Alvarez explained how they were going to take his DNA, Hernandez continued to indicate his understanding. When Alvarez asked him if he wanted to "give an example of his DNA," Hernandez said, "Yes." Furthermore, Alvarez translated the language on the form stating, "I understand I have the right to not give that sample . . . nor to sign this form." The record reflects that, after he was advised of his right not to give a sample or sign the form, Hernandez signed the form and allowed the officers to swab the inside of his mouth. *See Allridge v. State*, 850 S.W.2d 471, 493 (Tex. Crim. App. 1991) ("The showing that a suspect has been warned that he does not have to consent to the search and has a right to refuse is of evidentiary value in determining whether a valid consent was given."). Additionally, both Murray and Alvarez testified that Hernandez understood what they were telling him, that they were not being coercive during the interrogation, and that Hernandez agreed to allow the officers to take a sample of his DNA. *See Martinez v. State*, 17 S.W.3d 677, 683 (Tex. Crim. App. 2000) ("Testimony by law enforcement officers that no coercion was involved in obtaining the consent is also evidence of the consent's voluntary nature."). As for any errors in translation, they do not, by themselves, render consent invalid, as long as the totality of the circumstances demonstrate that the defendant freely and voluntarily consented. *See, e.g.*, *Mendoza v. State*, 30 S.W.3d 528, 532 (Tex. App.—San Antonio 2000, no pet.); *Cuero v. State*, 845 S.W.2d 387, 393 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd); *Moreno v. State*, 821 S.W.2d 344, 350-51 (Tex. App.—Waco 1991, pet. ref'd); *cf. Calixto v. State*, 66 S.W.3d 505, 510 (Tex. App.—Austin 2001, pet. ref'd) ("Questions regarding alleged inaccuracies in a translation are issues of fact that must be settled by the trier of

18

fact.").[6]  In this case, the totality of the circumstances supports the district court's finding that Hernandez freely and voluntarily consented to the seizure of his DNA.

Hernandez also contends that the interrogation was coercive because Detective Murray "intimidated" him.  As support for this contention, Hernandez cites to the following excerpt from the transcript of the interrogation:

| | |
|---|---|
| Murray: | With your DNA, it'll show, that you'll, you'll be the father of the baby. |
| Alvarez: | With your DNA, is going to teach [sic] . . . |
| Murray: | If you are the b-, the father. |
| Alvarez: | If you're the father, if you're the father. |
| Hernandez: | OK. |
| Murray: | So you need to tell me right now . . . Are you the father of that baby? |
| Alvarez: | You need to tell him right now if you're the father of the child. |
| Murray: | 'Cuz we will find out. |
| Alvarez: | Because we're going to know. |

Immediately thereafter, Hernandez admitted to having sexual relations with E.L.

_____

[6]  *See also Cancel v. State*, No. 01-02-00587-CR, 2003 Tex. App. LEXIS 1767, at *12 (Tex. App.—Houston [1st Dist.] Feb. 27, 2003, no pet.) (not designated for publication) ("[T]he ability of a suspect to speak fluent English or the ability of a police officer to speak fluent Spanish is not a prerequisite of a valid consent to search."); *Wilver v. State*, No. 14-99-01237-CR, 2001 Tex. App. LEXIS 2944, *7 (Tex. App.—Houston [1st Dist.] May 3, 2001, no pet.) (not designated for publication) (finding that trial court did not abuse its discretion in denying motion to suppress when Spanish-speaking officer explained consent forms to suspect in Spanish).

We find nothing in the above excerpt, or in the entirety of the interrogation, that rises to the level of "coercive" police conduct.[7] Even if some of Murray's statements could be construed as "intimidating," the totality of the circumstances surrounding the interrogation supports a finding by the district court that Hernandez's consent was not the product of duress or coercion. The interrogation lasted approximately 40 minutes. Both Murray and Alvarez testified that, during the interrogation, Hernandez was not threatened, was not promised anything, was not shown any weapons, did not appear to be in any kind of discomfort, did not ask to use the bathroom, and did not ask for something to drink or eat. This testimony was uncontroverted. Additionally, the district court viewed a videotape recording of the interrogation and was able to see for itself the behavior of the officers during the interrogation. The video, when considered with the testimony of the officers and the transcript of the interrogation, also supports the district court's finding that Hernandez's consent was voluntarily given.

The district court did not abuse its discretion in denying Hernandez's motion to suppress his DNA evidence. We overrule Hernandez's first point of error.

---

[7] *See, e.g.*, *Mincey v. Arizona*, 437 U.S. 385 (1978) (defendant subjected to 4-hour interrogation while incapacitated and sedated in intensive-care unit); *Greenwald v. Wisconsin*, 390 U.S. 519 (1968) (defendant, on medication, interrogated for over 18 hours without food or sleep); *Beecher v. Alabama*, 389 U.S. 35 (1967) (police officers held gun to the head of wounded confessant to extract confession); *Davis v. North Carolina*, 384 U.S. 737 (1966) (16 days of interrogation in closed cell without windows, limited food, and coercive tactics); *Reck v. Pate*, 367 U.S. 433 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); *Culombe v. Connecticut*, 367 U.S. 568 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); *Payne v. Arkansas*, 356 U.S. 560 (1958) (defendant held incommunicado for three days with little food; confession obtained when officers informed defendant that Chief of Police was preparing to admit lynch mob into jail); *Ashcraft v. Tennessee*, 322 U.S. 143 (1944) (defendant questioned by relays of officers for 36 hours without opportunity for sleep).

In his second point of error, Hernandez challenges the district court's denial of his motion to suppress evidence based on an alleged "illegal stop and arrest" at the police department. Hernandez claims that "probable cause did not exist . . . to justify the illegal stop and arrest of Defendant . . . incident to [his] stop to ask directions to renew his license and vehicle registration." Hernandez's complaint appears to be that, prior to being taken into custody, he was illegally restrained and identified in the police department lobby as a "direct result of inappropriate questioning by Rita Reyes, possibly based on a hunch from her discussions that morning with Nicolasa Fajardo."

This complaint is without merit. For one thing, the record supports a finding that, prior to his lawful arrest, Hernandez was not seized for purposes of the Fourth Amendment. To the contrary, the record reflects that Hernandez walked into the police department on his own accord to ask for directions to the vehicle registration office. The mere fact that Reyes asked to see his registration papers and identify himself did not transform this encounter into a Fourth Amendment seizure. *See Stoutner v. State*, 36 S.W.3d 716, 720 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) ("The mere asking of questions does not transform an encounter into a detention."). In any event, even if Hernandez was somehow illegally restrained by Reyes in the police department lobby, any "taint" from that action was obviated by his arrest on a valid warrant "minutes" after Reyes notified Detective Murray that Reyes was in the lobby. *See, e.g.*, *Johnson v. State*, 496 S.W.2d 72, 73-74 (Tex. Crim. App. 1973) (holding that evidence obtained subsequent to discovery of outstanding arrest warrants admissible even if initial detention at station was illegal); *Fletcher v. State*, 90 S.W.3d 419, 420-21 (Tex. App.—Amarillo 2002, no pet.) ("[D]iscovery of an outstanding

21

warrant during an illegal detention of an individual breaks the connection between the discovered evidence and the primary taint."); *Welcome v. State*, 865 S.W.2d 128, 134 (Tex. App.—Dallas 1993, pet. ref'd) (holding that legal arrest of appellant under outstanding warrant purged taint of any illegality of initial arrest).

The district court did not abuse its discretion in denying Hernandez's motion to suppress evidence based on an "illegal stop and arrest" at the police station. We overrule Hernandez's second point of error.

**Punishment issues**

In his third and fourth points of error, Hernandez asserts that the sentences imposed by the jury constitute cruel and unusual punishment in violation of the United States and Texas Constitutions. *See* U.S. Const. amend. VIII; Tex. Const. art. 1, § 13. In his fifth point of error, Hernandez similarly claims that the district court's order to have the sentences run consecutively constitutes cruel and unusual punishment.

The State claims that Hernandez failed to preserve these issues for appellate review. Hernandez asserts that he preserved error "by giving notice of his intent to appeal" after the district court announced Hernandez's sentences. However, to preserve error for appellate review, the record must show that the complaint was made by a timely objection "with sufficient specificity to make the trial court aware of the complaint" and that the defendant obtained a ruling from the trial court on that objection. *See* Tex. R. App. P. 33.1(a). The error preservation requirement extends to complaints of cruel and unusual punishment. *See Nicholas v. State*, 56 S.W.3d 760, 768 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (freedom from cruel and unusual punishment

under both Texas and Federal Constitutions waived by non-preservation in the trial court). The record reflects that, at trial, Hernandez did not object to his sentences as violating his right to be free from cruel and unusual punishment. Accordingly, any error is waived.

However, even were we to conclude that Hernandez preserved error, his complaints are without merit. Aggravated sexual assault of a child is a first-degree felony. Tex. Penal Code Ann. § 22.021(e). An individual adjudged guilty of a felony of the first degree shall be punished by imprisonment in the institutional division for life or for any term of not more than 99 years or less than 5 years. Tex. Penal Code Ann. § 12.32(a) (West 2003). In this case, the sentences imposed by the jury fall within the statutory range established by the legislature. As a general rule, when punishment assessed by the trial court comes within the range of punishment established by law, a penalty imposed within that range prescribed by the legislature will not be disturbed on appeal. *Nunez v. State*, 565 S.W.2d 536, 538 (Tex. Crim. App. 1978); *Holley v. State*, 167 S.W.3d 546, 549-50 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). While a prohibition against grossly disproportionate punishment survives under the Eighth Amendment to the United States Constitution apart from any consideration of whether the punishment assessed is within the range established by the Legislature, *see Solem v. Helm*, 463 U.S. 277, 290 (1983), there is nothing in the record before us to indicate that the sentences assessed in this case are grossly disproportionate to the gravity of the offense of aggravated sexual assault of a child.

Furthermore, it is well established that, as a general rule, the cumulation of sentences does not constitute cruel and unusual punishment. *See Stevens v. State*, 667 S.W.2d 534, 538 (Tex. Crim. App. 1984); *Williamson v. State*, 175 S.W.3d 522, 524 (Tex. App.—Texarkana 2005,

23

no pet.); *Meadows v. State*, 998 S.W.2d 318, 323 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd). There is an exception to this rule if the punishment assessed is grossly disproportionate to the gravity of the offenses committed. *See Solem*, 463 U.S. at 290-91. However, there is nothing in the record before us that leads us to believe the exception should apply in this case. Hernandez was convicted of two counts of aggravated sexual assault of a twelve-year-old child. One of the assaults resulted in the child becoming pregnant. Comparing the gravity of the offenses to the severity of the aggregated sentence, we find nothing grossly disproportionate about the district court stacking the sentences in this case. *See Williamson*, 175 S.W.3d at 525 (upholding appellant's punishment of three consecutive life sentences for three counts of aggravated sexual assault of child).

We overrule Hernandez's third, fourth, and fifth points of error.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed

Filed:   February 25, 2009

Do Not Publish

24